**PHARMACIA, INC., and Endre Balazs, Plaintiffs,**

v.

**FRIGITRONICS, INC., Precision–Cosmet, Inc., and Medchem Products, Inc., Defendants.**

**Civ. A. No. 84–1923–K.**

United States District Court, D. Massachusetts.

Dec. 14, 1989.

James L. Sigel, Ropes & Gray, Boston, Mass., Hugh A. Chapin, Alan P. Bowes, Arthur D. Gray, Richard S. Gresalfi, Kenyon & Kenyon, New York City, for plaintiffs.

Marshall Tatun, David J. Brody, Stephen Korn, Widett, Slater & Goldman, Boston, Mass. (Daniel Kane, Gerald Levy, Joseph Eisele, Kane, Dalsimer, Kane, Sullivan and Kurucz, New York City, of counsel), Howard Cooper, John Regan, Hale & Dorr, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

KEETON, District Judge.

On October 17, 1975, after more than thirty years of research, Dr. Endre Balazs applied for a patent for "Ultrapure Hyaluronic Acid and the Use Thereof." On February 27, 1979, that patent was issued as United States Patent No. 4,141,973 ("the '973 patent"). In this action, Dr. Balazs and Pharmacia, Inc. allege that Frigitronics, Inc., Precision–Cosmet, Inc. and MedChem Products, Inc. have infringed that patent.

Plaintiffs moved for a preliminary injunction on July 20, 1989 (Docket No. 81). In defense, MedChem asserted *inter alia* that the hyaluronic acid of the '973 patent was "on sale ... more than one year prior to the date of the application for patent in the United States"—that is, that it was "on sale" before the "critical date" of October 17, 1974—and that consequently, under 35 U.S.C. § 102(b), the patent that the defendants were alleged to have infringed was not valid. In a phase-I trial, conducted

before the hearing on preliminary injunction, the court determined that this on-sale defense was without merit. Memorandum and Order of October 12, 1989, 726 F.Supp. 876 (hereinafter "the October 12th Memorandum"). MedChem seeks reconsideration of that ruling before the hearing on preliminary injunction scheduled for December 20, 1989. Motion for Reconsideration (Docket No. 156).

The parties have each filed both a memorandum (Docket Nos. 157 and 158) and a reply memorandum (Docket Nos. 162 and 183) in support of their respective positions. Also, proposed intervenor Iolab Corporation has filed a brief as amicus curiae in support of the motion for reconsideration (Docket No. 160) (hereinafter "Iolab's Brief"). In light of these extensive submissions, I conclude that oral argument will not assist me in ruling on this motion. Accordingly, defendant's request for oral argument is denied.

## I.

MedChem moves for reconsideration on the grounds that "certain of the Court's findings were in direct conflict with the uncontroverted evidence in this action and the Court's application of the law is in conflict with controlling legal precedents as discussed in [*RCA Corp. v. Data General Corp.*, 887 F.2d 1056 (Fed.Cir.1989)]." MedChem's Memorandum in Support of Motion for Reconsideration (Docket No. 157) (hereinafter "MedChem's Memorandum") at 1. *RCA Corp.*, which was published on October 11, 1989, did not change the applicable legal principles developed in earlier precedents and applied by this court in the October 12th Memorandum. Indeed, although an on-sale defense was sustained in *RCA Corp.*, the reasoning of the Federal Circuit in that case reinforces the conclusion that the on-sale defense is meritless in this case.

In *RCA Corp.*, the Federal Circuit again emphasized basic characteristics of the on-sale defense:

As explained in *UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed. Cir.1987), *cert. denied*, [484 U.S. 1025]

108 S.Ct. 748 [98 L.Ed.2d 761] (1988), determination that a patent is invalid by reason of being on-sale within the meaning of section 102(b) "does not lend itself to formulation into a set of precise requirements." However, to make a *prima facie* case, "the challenger has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. *Cf. D.L. Auld [Co. v. Chroma Graphics Corp.]*, 714 F.2d [1144,] 1150 [ (Fed.Cir.1983) ] (102(b) only)." *Id.*

887 F.2d at 1059 (parallel citations omitted).

 Although even a single offer of sale before the critical date can be debilitating, *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1311 (Fed.Cir.1988), such a sale or offer of sale invalidates a patent only if there is identity between the product sold or offered for sale and the later-claimed invention. "If the inventor had merely a conception or was working towards development of that conception, it can be said that there is not yet any 'invention' which could be placed on sale." *UMC Electronics Co.*, 816 F.2d at 657. Furthermore, even if a pre-critical date sale or offer of sale of the later-claimed invention is shown, the invention is not " 'on sale' within the statute's meaning ... [if] the primary purpose underlying the [sale or] offer for sale was experimental and not commercial." *In re Hamilton*, 882 F.2d 1576, 1580 (Fed.Cir. 1989).

 As noted by the Federal Circuit in *RCA Corp.*, to make a *prima facie* case of invalidity, the challenger has the burden of proving that the later-claimed invention was "on sale" before the critical date. 887 F.2d at 1059; 35 U.S.C. § 282. To satisfy that burden, the challenger must prove, by clear and convincing evidence, (1) that the product of the later-claimed invention existed before the critical date, and (2) that debilitating sales or offers of sale of that product were made before the critical date.

*Buildex Inc. v. Kason Industries*, 849 F.2d 1461, 1463 (Fed.Cir.1988). It is upon the first element of the *prima facie* case that MedChem has stumbled. I found in the October 12th Memorandum that MedChem failed to prove by any standard, and certainly failed to prove by clear and convincing evidence, that the ultrapure hyaluronic acid of the '973 patent existed before the critical date. Consequently, there was "not yet any 'invention' which could [have been] placed on sale." *UMC Electronics Co.*, 816 F.2d at 657.

The Federal Circuit has noted that on-sale cases are rarely "easy," and that the facts of each case should be weighed in view of the public policies underlying § 102(b):

> [T]his area of the law "encompasses an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules." Rigid standards are especially unsuited to the on sale provision where the policies underlying the bar, in effect, define it.

> As a result, this court has been careful to avoid erecting rigid standards for section 102(b)....

> The authorities agree that the facts of each case must be weighed in view of public policy. Public policy favors prompt and widespread disclosure of inventions to the public, while giving the inventor a reasonable amount of time (1 year by statute) to determine whether a patent is worthwhile, but precluding attempts by the inventor or his assignee from commercially exploiting the invention more than a year before the application for patent is filed.

> A determination of whether an invention has been placed on sale within the meaning of section 102(b) must be decided on the facts of each case. To give effect to the underlying policies, the court will want to consider the totality of the circumstances relating to the character and extent of commercial activities, the type of invention and its stage of development as evidenced by engineering models, prototypes, and production models, along with the character and extent of bona fide experimentation.

*Western Marine Electronics, Inc. v. Furuno Electric Co.*, 764 F.2d 840, 844–45 (Fed. Cir.1985) (citations omitted).

In light of these legal principles, I turn to MedChem's Motion for Reconsideration.

## II.

MedChem asserts: (A) that the court erred in ruling that Dr. Balazs did not have the hyaluronic acid of the '973 patent before the critical date, and (B) that the court should have and did not address separately each pre-critical date sale or offer to parties other than Pharmacia.

## A.

■ First, MedChem asserts that the court erred by finding that the hyaluronic acid of the '973 patent did not exist before the critical date and, consequently, could not have been placed "on sale" before the critical date. In support of this assertion, MedChem cites Dr. Balazs' declaration made in 1986 to the Patent and Trademark Office during the re-examination of the patent at issue:

> [B]y 1974 I had determined that the presence of white blood cells in the aqueous of the owl monkey eye (the "cell count test") was a highly sensitive measure of inflammation, and that when a hyaluronic acid preparation produced no more than 200 white blood cells per $mm^3$ of aqueous humor in the cell count test, the preparation would be non-inflammatory in human eyes.

PTX–662 at ¶ 38.

This statement, MedChem claims, proves that Dr. Balazs had "established the 200–cell–count criteria and knew it to be non-inflammatory in human eyes by 1974." MedChem's Memorandum at 4. This part of MedChem's contention is supportable and, despite defendant's assertion, is consistent with the court's findings in the October 12th Memorandum. Dr. Balazs had been experimenting with the quantitative eye test since 1971, but it was not until "late

1973 or 1974" that he conclusively determined that hyaluronic acid that induced fewer than 200 white blood cells in the quantitative test was non-inflammatory. Balazs Declaration (Docket No. 97) at ¶ 27; *see also* DTX–212 at 34.

Citing this 1986 declaration, MedChem also asserts that, by 1974, "[o]nce Dr. Balazs knew that hyaluronic acid which produced less than a 200 cell count in owl monkey eyes was noninflammatory in humans and he had in fact produced such a hyaluronic acid, his invention was reduced to practice." MedChem's Reply Memorandum in Support of Motion for Reconsideration (Docket No. 162) at 2–3. This defense contention is not supported.

First, Dr. Balazs' determination in "late 1973 or 1974" that hyaluronic acid that met the 200–white–blood–cell–count was non-inflammatory did not signify a reduction to practice. Having determined the test criteria, Dr. Balazs had to continue his experiments to determine whether he was able to produce a lot of hyaluronic acid that met this test—that was non-inflammatory.

Second, even that event—even the production of a lot of hyaluronic acid that was non-inflammatory under this test—was not enough to render the hyaluronic acid reduced to practice. Rather, for the reasons discussed below, there was no reduction to practice until Dr. Balazs could repeat, with some degree of consistency, his production of lots of hyaluronic acid that met his criteria.

In arguing that proof of production of the first batch of hyaluronic acid capable of satisfying the test criteria is like showing that the invention at issue in *RCA Corp.* "had been built," 887 F.2d at 1061, MedChem misreads and misapplies *RCA Corp. Id.* ("actual reduction to practice of the subject invention means, *inter alia*, that an actual embodiment which included *all elements* of the claim had been built"). As noted earlier in this Memorandum, in *RCA Corp.*, the Federal Circuit emphasized that

"determination that a patent is invalid by reason of being on-sale within the meaning of section 102(b) 'does not lend itself to formulation into a set of precise requirements.'" *Id.* at 1059. *See also Western Marine Electronics*, 764 F.2d at 844 (rejecting use of "rigid standards" and "mechanically-applied, technical rules"). The imagery of an invention that "ha[s] been built"—or of a moment in time when "all elements of the claim ha[ve] been built"—is quite apt when applied to adding the last essential element of an *operational* device that is the first embodiment of the inventor's idea. In contrast, this imagery is more mystifying than clarifying when applied to efforts to extract from natural sources the product of the '973 patent—an ultrapure form of hyaluronic acid. *Western Marine Electronics*, 764 F.2d at 845 (court should consider totality of circumstances including "the type of invention"). Here, the inventor's conception is not of "building" an operational device. In this context, "once" is not a "practice." [1]

Nor is producing a desired outcome once a "reduction to practice." Even after producing some lots of hyaluronic acid that met his criteria, Dr. Balazs had to continue his experiments to determine whether he could, with at least a degree of consistency sufficient to constitute a "reduction to practice," reproduce this non-inflammatory hyaluronic acid. If he were only able to produce lots of non-inflammatory hyaluronic acid because of fortuitous, non-reproducible occurrences, then it could not be said that he had reduced non-inflammatory hyaluronic acid to "practice." *See* Balazs Test., Day II, Afternoon Sess., pp. 41–44; Day III, Morning Sess., pp. 128–129.

For all these reasons, contrary to MedChem's assertion, I conclude that Dr. Balazs did not reduce the hyaluronic acid of the '973 patent to practice when he first settled upon the 200–white–blood–cell criteria in "late 1973 or 1974." I find that Dr. Balazs continued his experimentation throughout 1974, and that it was not until

---

[1]. Plaintiffs' reliance on *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271 (5th Cir.), *cert. denied sub nom., Sauquoit Fibers Co. v. Leesona Corp.*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), for an explanation of the application of "reduction to practice" to the instant situation is similarly more mystifying than clarifying.

after the critical date that he achieved an "actual reduction to practice."

It bears emphasis that the experimentation that continued in this case throughout 1974, both as to the product and as to its properties, was experimentation central to the claimed features of the invention. It is thus to be distinguished from "experiments performed with respect to non-claimed features of an invention," as that phrase has been used both by the Federal Circuit, *RCA Corp.*, 887 F.2d at 1061, and its predecessor court, *In re Theis*, 610 F.2d 786, 793 (C.C.P.A.1979).

In light of this discussion, I also reject Iolab's contention that:

> Even prior to his establishment of the cell-count parameter of his claims, Dr. Balazs also sold substantial amounts of material that would have met that parameter, as well as all other claim limitations, had it been tested. Dr. Balazs' invention, therefore, is treated under the law as having been "on sale" even though he did not know at the time that the product he was selling would meet the criteria of his later-filed patent claims. It is enough that the product inherently met the claims.

Iolab's Brief at 15 (citing *W.L. Gore & Associates v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)). This contention is contrary to the law with regard to "reduction to practice" in the context at bar. Also, for the reasons explained in the October 12th Memorandum, this contention is unsupportable under *Elizabeth v. Pavement Co.*, 97 U.S. 126, 24 L.Ed. 1000 (1877) (not public use where pavement, which inherently met claims of later-filed patent claim during six years of testing on Boston street, was used for experimental purposes to determine whether pavement was suitable for intended purposes). Finally, this contention is not supported by Iolab's reliance on *W.L. Gore & Associates* (consistent and reproducible anticipatory use raises § 102(a) bar).

There is a second, independent reason for holding that the hyaluronic acid of the '973 patent was not reduced to practice before the grace period (that is, a reason distinct from the finding that Dr. Balazs did not yet have a "practice" for producing ultrapure hyaluronic acid). As the Federal Circuit has held, an invention is "not reduced to practice until it [is] sufficiently tested to demonstrate that it [will] work for its intended purpose." *Great Northern Corp. v. Davis Core & Pad Co.*, 782 F.2d 159, 165 (Fed.Cir.1986); *see also Elizabeth.* Here, it was not until after the critical date that Dr. Balazs determined that the hyaluronic acid that he was able to produce would "work for its intended purpose"—would be non-inflammatory for purposes of eye surgery, treatment of joints, and for other therapeutic uses. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Without such a determination, there can be no reduction to practice, and in the context of this case, no invention that could be placed "on sale."

Finally, an analysis of the public policies underlying and defining the on-sale bar reinforces the determination that Dr. Balazs did not place the non-inflammatory hyaluronic acid of the '973 patent "on sale" before the critical date. Those policies favor "prompt and widespread disclosure of inventions to the public, ... but preclud[e] attempts by the inventor or his assignee from commercially exploiting the invention more than a year before the application for patent is filed." *Western Marine Electronics*, 764 F.2d at 845. It is crystal clear in this case that Dr. Balazs acted consistently with these public policies. Dr. Balazs did not attempt to remove or withhold his invention from the public. Rather, I find as fact finder, he sought to isolate and purify hyaluronic acid, and to make it available for world-wide disclosure and distribution, as promptly as possible. Dr. Balazs did not attempt to exploit his invention commercially beyond the statutorily authorized 17–year period.

Accordingly, for the foregoing reasons and for the reasons set forth in the October 12th Memorandum, I reaffirm my finding that the hyaluronic acid of the '973 patent

did not exist, and could not have been placed "on sale," before the critical date.

### B.

MedChem next claims that the court erred when it considered the sales to Pharmacia but, as MedChem phrases its contention, "failed to address the numerous other offers for sale and sales by Balazs." Med-Chem's Memorandum at 6. The contention that the court must make separate findings of fact with respect to every alleged sale is without merit on several grounds.

■ Because the court has found that Dr. Balazs did not have the hyaluronic acid of the '973 patent before the critical date, any sales or offers of the forms of hyaluronic acid that were made before the critical date—whether for therapeutic uses or for use as a "laboratory chemical"—were not sales or offers of the hyaluronic acid of the '973 patent. This is so regardless of how disputed issues about details of each transaction might be resolved, were it relevant to address them.

■ Moreover, even if one were to assume, as defendant contends, that the hyaluronic acid of the patent did exist before the critical date, the outcome of this case is the same because I find that the hyaluronic acid was not "reduced to practice" until after the critical date and that all sales and offers of the hyaluronic acid in the months before the critical date were for experimental purposes and consequently do not raise a § 102(b) bar.

As noted above, Dr. Balazs did not settle on the 200–white–blood–cell criteria until "late 1973 or 1974." Dr. Balazs then continued to experiment with methods of production and with lots of hyaluronic acid to determine whether those lots met the 200–white–blood–cell test. Thus, even if one were to assume that Dr. Balazs did have the hyaluronic acid of the patent at some time before the critical date, it is crystal clear that he could not have possibly had the hyaluronic acid of the '973 patent before January 1974. *See* DTX–662 at ¶ 38 (200–white–blood–cell limit not established until late 1973, early 1974); Balazs Declara-

tion at ¶ 27; DTX–72 at 5 (in letter of January 14, 1974, Dr. Balazs reported to Pharmacia that "[it] seems to me that we have finally solved the problem of both sterility and production of 'good' preparations"). Accordingly, all sales or offers before January 1974 were of a product other than the hyaluronic acid of the '973 patent and are irrelevant to the on-sale defense.

The bulk of the sales made between January 1 and October 17, 1974 were to Pharmacia. Under the totality of the circumstances standard as promulgated in *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1564 (Fed.Cir.1987) and *Western Marine Electronics*, 764 F.2d at 845, and for the reasons discussed in the October 12th Memorandum, I find that "the primary purpose underlying [each sale to Pharmacia during this period] was experimental and not commercial"—that these sales were for the purposes of determining whether the hyaluronic acid was fit for its intended purposes. *Hamilton*, 882 F.2d at 1580. As fact finder, I thus reject MedChem's and Iolab's characterizations of these sales as being made primarily for the purposes of determining whether Pharmacia wished to exercise its option rights, whether the hyaluronic acid was commercially viable, and whether the hyaluronic acid was worthy of governmental approval. As fact finder, I also reject, as noted above, the suggestion that these sales were for experiments conducted primarily as to non-claimed features of the invention. Accordingly, these sales did not place the hyaluronic acid "on sale" under 35 U.S.C. § 102(b).

The only other sale of hyaluronic acid during this period was a January 18, 1974 sale to the Boston Biomedical Research Institute, a non-profit laboratory of which Dr. Balazs was Research Director. DTX–246. Considering the totality of the circumstances, I find that this sale was made for experimental purposes, and that consequently, it too does not raise a § 102(b) bar. *See,* Balazs Declaration at ¶¶ 25, 67–69; Balazs Testimony, Transcript, Day III, Morning Session at 102.

Finally, the only other relevant activity with regard to hyaluronic acid during this period was a letter to Dr. A.W. Kersjes on August 19, 1974 in which Dr. Balazs wrote:

> Our company is producing hyaluronic acid and is selling it in the USA under the tradename of Healon. Healon is produced from two sources: umbilical cords and rooster combs. This is a special fraction of sodium hyaluronate which is sterile, pyrogen-free and has a high molecular weight.
>
> Healon under human and veterinary trials is used for the treatment of osteoarthritis, traumatic arthritis and for the replacement of the vitreous in the eye. Other applications for Healon are under laboratory investigation.
>
> In Europe Pharmacia AB, Uppsala, Sweden has the rights to market this product. They are in the process of clinical trials.
>
> At this time neither here nor in Europe is Healon marketed as a drug. It is available for clinical trial or as a chemical for laboratory use.
>
> I am enclosing some reprints. If you are interested in participating in the clinical trials of Healon, please contact Pharmacia AB.

DTX–155. I find that this letter was at most an offer to "participat[e] in the clinical trials of Healon," and that, under the totality of the circumstances, this letter was not an offer to commercially sell the hyaluronic acid of the '973 patent. *See,* Balazs Declaration at ¶ 64; Balazs Testimony, Transcript, Day III, Morning Session at 118–120.

Thus, even if, for the purpose of defendant's contention, one assumes that the hyaluronic acid of the patent did exist as early as January 1974, the outcome is the same because I find that all sales and offers between January 1 and October 17, 1974 were for experimental purposes. *See*

*Elizabeth* 97 U.S. at 134 ("The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use"). Consequently, I conclude that Dr. Balazs did not place the hyaluronic acid "on sale" under 35 U.S.C. § 102(b) more than one year before the application for the patent.

### III.

The court has considered MedChem's and Iolab's other contentions and finds them without merit. Accordingly, the court reaffirms its holding that MedChem failed to prove by clear and convincing evidence that the hyaluronic acid of the '973 patent was "on sale" more than one year before the date of the application for the patent.

It is therefore ORDERED: Defendant MedChem's Motion for Reconsideration is DENIED.[2]

---

**2.** The court does, however, hereby modify the October 12th Memorandum by correcting two numerical errors. The corrections are identified by emphasis in the following two sentences. First, the sentence beginning on page 16 at line 11 should read: "The lab notebook entry of February 17, 19*72* shows that samples of hyaluronic acid from Batch C, which were packaged for horses, yielded a result of 4+." Second, the sentence beginning on page 21 at line 21 should read: "Dr. Balazs' first quantitative test, performed on batch 11*1*0, yielded a reaction of 300 white blood cells."