**ELAN CORPORATION, PLC, Plaintiff and Counter–Defendant,**

v.

**ANDRX PHARMACEUTICALS, INC, Defendant and Counter– Plaintiff.**

**Elan Corporation, PLC, Plaintiff and Counter–Defendant,**

v.

**Andrx Pharmaceuticals, Inc, Defendant and Counter–Plaintiff.**

**Nos. 98–7164–CIV, 98–7057–CIV.**

United States District Court, S.D. Florida, Miami Division.

March 14, 2002.

Order on Post Trial Motions March 24, 2003.

Steven Ira Peretz, Kluger Peretz Kaplan & Berlin Miami Center, Miami, FL, James B. Monroe, Liam O'Grady, James R. Barney, Finnegan Henderson Farabow Garrett & Dunner, Washington, DC, Terri Ellen Tuchman Meyers, Kluger Peretz Kaplan & Berlin, Fort Lauderdale, FL, for Elan Corp., PLC.

Gerald J. Houlihan, Houlihan & Partners, Miami, FL, for Andrx Pharmaceuticals, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

Elan Corporation filed suit against Andrx Pharmaceuticals for patent infringement under 35 U.S.C. §§ 271(e) and 281–283. Andrx answered and interposed counterclaims, including a claim that Elan's patent was invalid. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1338, 2201 and 2202, and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

After considering the evidence and arguments presented at a bench trial, I conclude that Elan's patent is invalid by virtue of the on-sale bar. *See* 35 U.S.C. § 102(b). As explained below, Elan commercially offered to sell an embodiment of its patent— a once-daily tablet with controlled release of naproxen—to Lederle Laboratories in 1987, several years prior to the critical date under § 102(b).

## I. BACKGROUND AND PROCEDURAL POSTURE

Elan is an Irish corporation having its corporate offices and principal place of business in Dublin, Ireland. *See* Pretrial Stipulation at Exh. 3 ¶ 1 [D.E. 79] (April 14, 2000).[1] Elan is engaged in the business of researching and developing new pharmaceutical products, and sells these new products throughout the world. *See id.* ¶ 2.

Andrx is a Florida corporation with its corporate offices and principal place of business in Fort Lauderdale, Florida. *See id.* ¶ 13. Since the filing of the original statement of undisputed facts, Andrx has moved its corporate offices to Davie, Florida, but continues to maintain manufacturing facilities at its Fort Lauderdale address. *See* Andrx's Post Trial Findings of Fact and Conclusions of Law at 2 n. 3 [D.E. 212] (March 12, 2001). Andrx is engaged in the business of developing generic equivalents to brand-name pharmaceutical products. *See* Pretrial Stipulation at Exh. 3 ¶ 4.

### A. NAPROXEN SODIUM

Naproxen sodium is a non-steroidal, anti-inflammatory drug (NSAID) exhibiting analgesic and antipyretic properties. *See id.* ¶ 5; Plaintiff's Exh. 302 at 6. Naproxen sodium is commonly used to relieve mild to moderately severe pain caused by rheumatoid arthritis, osteoarthritis, and other inflammatory conditions. Chronic complaints make it desirable to maintain a constant level of medication in the patient's blood stream over a period of time. *See* Pretrial Stipulation at Exh. 3 ¶ 6; Plaintiff's Exh. 302 at 6.

---

1. All record cites to civil docket entry numbers are designated as "D.E. ___." In the absence of a reference to a specific civil action number, all such references are to Case No. 98–7164. Most of the exhibits and documents referenced have been filed with the clerk by separate order.

## B. ELAN'S COMMERCIAL NAPROXEN SODIUM PRODUCT

On March 29, 1994, Elan filed, with the Food and Drug Administration (FDA), New Drug Application (NDA) No. 20–353 directed to Naprelan®. *See* Pretrial Stipulation at Exh. 3 ¶ 10. This filing consisted of 305 volumes and over 40,000 pages of information, including clinical data demonstrating the safety and effectiveness of Naprelan®. *See id.* The FDA approved Elan's Naprelan® NDA on January 5, 1996. *See id.* ¶ 11. Naprelan® was launched commercially in April of 1996. *See id.* ¶ 12. In 1997, during the first full year of production, Naprelan® sales in the United States exceeded $100 million. *See id.* ¶ 13.

## C. ELAN'S '320 PATENT

Elan is the assignee of U.S.Patent No. 5,637,320 (the '320 patent) and presently retains all rights to the '320 patent. *See id.* ¶¶ 16, 23. The '320 patent—which remains in force until June 10, 2014—lists two inventors: Edward A. Bourke and Seamus Mulligan. *See id.* ¶¶ 21–22. Elan manufactures and sells a controlled-release form of naproxen sodium under the brand name Naprelan®. *See id.* ¶ 8. Naprelan® provides naproxen sodium in a tablet form which may be administered once a day, for 24–hour relief. *See id.* ¶ 9. The parties agree that the formulation of Naprelan® "falls within the scope of the claims" of the '320 patent. *Id.* ¶ 16.[2]

The claims of the '320 patent are directed to naproxen formulations for once-daily oral administration, comprising naproxen in a multi-particulate pellet form, to allow a controlled release of the naproxen. *See* Plaintiff's Exh. 302 at 6. Each of the controlled-release pellets of the formulation has a core of naproxen, or a pharmaceutically acceptable salt of naproxen, in association with an organic acid. *See id.* A multi-layer membrane surrounds each core. *See id.* The drug-acid core of the pellet works in conjunction with the multi-layer membrane to provide a controlled release of naproxen over an extended time period. *See* Testimony of Christopher Rhodes, Trial Transcript at 538, 540 (Feb. 4, 2001); Plaintiff's Exh. 302 at 6. In one claimed embodiment of the invention, a second portion of naproxen also may be added, designed to promptly release the drug after oral administration. *See* Plaintiff's Exh. 302 at 6–7. The second portion of naproxen provides an immediate analgesic effect to accompany the sustained delivery of the medication. *See id.*

By providing naproxen in a controlled-release form that may be administered once a day, Elan's patented technology eliminated the need for patients suffering from chronic pain and discomfort to take repeated doses of prior medications, which were administered two to four times per day to provide continuous relief. *See* Rhodes Testimony, Trial Transcript at 542; Plaintiff's Exh. 302 at 7. Elan's patented technology also reduced the level of gastrointestinal irritation associated with prior medications, which can lead to great discomfort and can even lead to serious medical problems such as ulcers. *See* Plaintiff's Exh. 302 at 7.

The membrane in the patented formulation delays and controls the dissolution and release of the naproxen, allowing sustained delivery for 24–hour relief. *See id.* The membrane additionally eliminates "dose dumping" and reduces the amount of direct contact of the drug with the gastrointestinal tract, thus reducing irritation. *See* Rhodes Testimony, Trial Transcript at

---

**2.** Given the parties' agreement on this issue, there is no need for me to independently determine whether Naprelan® meets the limitations of the claims of the '320 patent. *See generally Dana Corporation v. American Axle & Mfg.,* 279 F.3d 1372, 1375 (Fed.Cir.2002).

542; Plaintiff's Exh. 302 at 7–8. The organic acid in the pellet core adjusts the micro-environment pH in the core and thereby assists in delaying dissolution and release of the naproxen. *See* Plaintiff's Exh. 302 at 7.

### 1. PROSECUTION OF THE '320 PATENT

On January 15, 1990, Elan filed in the Republic of Ireland a provisional patent application entitled "Controlled Absorption Naproxen Formulation for Once–Daily Administration" (the Irish priority application). *See* Pretrial Stipulation at Exh. 3 ¶ 17. On January 14, 1991, Elan filed U.S.Patent Application Serial No. 07/641,441, claiming a priority date of January 15, 1990, under 35 U.S.C. § 119, based on the earlier-filed Irish priority application. *See id.* ¶ 18.

On June 1, 1993, Elan filed a continuing patent application under 37 C.F.R. § 1.62 of prior application Serial No. 07/641,441, which the PTO assigned U.S. Serial No. 08/070,659. *See id.* ¶ 19. That application included a claim to priority of the earlier-filed Irish priority application. *See id.* On April 14, 1994, Elan filed a continuing patent application under 37 C.F.R. § 1.62 of prior application Serial No. 08/070,659, which the PTO assigned U.S. Serial No. 08/227,566. That application also included a claim to priority of the earlier-filed Irish priority application. Continuing patent application Serial No. 08/227,566 matured into the '320 patent, which issued on June 10, 1997. *See id.* ¶ 20.

Marla Church was a registered U.S. patent agent during the prosecution of the applications leading to the '320 patent and participated in the prosecution of the '320 patent. *See id.* ¶ 24. On May 21, 1991, Ms. Church submitted an Information Disclosure Statement (IDS) to the PTO, listing 11 separate references. *See id.* ¶ 25. Ms. Church does not know who informed her of the identity of the 11 separate references. *See id.* An article—Kelly *et al.,* "Pharmacokinetic Properties and Clinical Efficacy of Once–Daily Sustained Release Naproxen," 36 Eur.J.Clin.Pharmacol. 383 (1989) (hereinafter "Kelly")—was included in the Elan IDS submitted to the PTO during the prosecution of the '320 patent. *See id.* ¶ 28; Defendant's Exh. 10. European Patent Application No. 0255002/A1 (Rotini *et al.*) was also included in Elan's IDS submitted to the PTO during the prosecution of the '320 patent, as was European Patent Application No. 0313328/A1 (Barry *et al.*). *See id.* ¶¶ 30–31.

Examiner Raj Bawa, Ph.D., the examiner at the PTO who reviewed the applications that led to the '320 patent, considered all of the references listed in the IDS submitted by Ms. Church during the prosecution of the '320 patent. *See id.* ¶ 26. Examiner Bawa found the claims that issued in the '320 patent to be patentable over all references listed in the IDS submitted by Ms. Church during the prosecution of the '320 patent. *See id.* ¶ 27.

### 2. CLAIMS OF THE '320 PATENT

The '320 patent contains one independent claim, Claim 1. *See id.* ¶ 32. Claims 3, 5, 11, 12 and 16 are dependent on Claim 1. Claims 6 and 8 are dependent on Claim 5. Claims 13, 14, 15, and 17 are dependent on Claim 12. *See id.* ¶ 34.

Patents are directed to those skilled in the art to which they pertain, and patent claims are interpreted as they would be understood by those skilled in the art. *See generally Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc* ), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The '320 patent is directed to those skilled in the art of pharmaceutical formulations. A person of ordinary skill in the art of pharmaceutical formulations is an individual having at least a bachelor's

degree in chemistry, chemical engineering, pharmacy, or some other discipline involving the chemical or pharmaceutical sciences, as well as several years post-baccalaureate practical experience in the field of pharmaceutical formulation. *See* Pretrial Stipulation at Exh. 3 ¶ 93.

### D. ANDRX'S ANDA

Andrx employees Jianbo Xie, Steve Jan, and Chih–Ming Chen developed a sustained-release naproxen sodium product. *See id.* ¶ 33. On July 16, 1998, Andrx filed Abbreviated New Drug Application (ANDA) No. 75–416 (the Andrx ANDA) requesting permission from the FDA to sell a generic version of Elan's brand name Naprelan® 550 mg of product. *See id.* ¶ 42. The Andrx ANDA product that was the subject of this initial ANDA filing contains 550 mg naproxen sodium, which is equivalent to 500 mg of naproxen. *See* Plaintiff's Exh. 20 at BN A001434; Plaintiff's Exh. 325 at n. 1. Consequently, Andrx's ANDA product is sometimes referred to in testimony and documents as a 550 mg product and sometimes as a 500 mg product. *See* Plaintiff's Exh. 20 at BN A001434; Plaintiff's Exh. 325 at n. 1.

The FDA granted the Andrx ANDA tentative approval on March 17, 2000. *See* Pretrial Stipulation at Exh. 3 ¶ 44. The FDA concluded that the 550 mg naproxen sodium product that was the subject of the Andrx ANDA was bioequivalent to Naprelan®. *See id.* ¶ 45. "Bioavailability" is the rate and extent to which a drug enters a patient's bloodstream. To establish that a proposed generic version of a brand drug is "bioequivalent" to a brand drug, one must submit evidence to the FDA that the bioavailability of the generic drug is essentially the same as the brand drug. *See* Rhodes Testimony, Trial Transcript at 241.

On May 11, 2000, Andrx filed an amendment to its ANDA requesting permission from the FDA to sell a lower dosage strength of the product described in its ANDA, namely, a generic version of Elan's 412.5 mg Naprelan® product. *See e.g.,* Complaint for Patent Infringement ¶¶ 7–8 [D.E. 1 in Case No. 00–7057] (July 26, 2000). The Andrx ANDA product that was the subject of the amendment contains 412.5 mg of naproxen sodium, which is equivalent to 375 mg of naproxen. *See* Plaintiff's Exh. 325 at n. 1. Andrx's ANDA product is alternatively referred to in testimony and documents as a 412.5 mg product and sometimes as a 375 mg product. *See id.* The FDA has not yet approved Andrx's amendment to its ANDA directed to this lower dosage strength product. *See* Complaint for Patent Infringement at Exh. B.

### E. THE CONSOLIDATED ACTIONS

The Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch–Waxman Act) established the procedures under which Andrx filed its ANDA and Elan filed this action. *See* 21 U.S.C. § 355(j)(2)(A)(iv). The Hatch–Waxman Act permits a generic manufacturer to obtain approval to market a generic version of a previously approved pharmaceutical product without conducting expensive and time consuming tests to establish the safety and effectiveness of that product. *See id.* In place of these safety and efficacy tests, the generic manufacturer must demonstrate that its ANDA product is bioequivalent to the branded product. *See id.*

The Hatch–Waxman Act requires that an ANDA applicant submit a Paragraph IV certification in its ANDA that the product it seeks FDA approval to market will not infringe any valid U.S. patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The Hatch–Waxman Act also requires that an ANDA applicant notify the holder of a patent for which it submits a certification that it has made such a certification. *See* 21 U.S.C.

§ 355(j)(2)(B)(ii). That notice must set forth "a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed." *Id.*

### 1. CASE NO. 98–7164—FIRST SUIT DIRECTED TO ANDRX'S 550 MG PRODUCT

On or about September 10, 1998, Elan received from Andrx a first Notice of Certification under 21 C.F.R. § 314.95 (Certification Notice), informing Elan of Andrx's initial ANDA submission directed to Elan's 550 mg product, and corresponding certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV). *See* Pretrial Stipulation at Exh. 3 ¶ 96; Plaintiff's Exh. 7. Andrx's Certification Notice directed to Elan's 550 mg product did not contain any allegations as to the validity or enforceability of the '320 patent. *See* Pretrial Stipulation at Exh. 3 ¶ 97; Plaintiff's Exh. 7.

On October 23, 1998, Elan filed Case No. 98–7164, asserting that Andrx's ANDA submission directed to Elan's 550 mg product constituted an act of patent infringement. *See* Pretrial Stipulation at Exh. 3 ¶ 98; Complaint for Patent Infringement [D.E. 1] (Oct. 23, 1998). Andrx answered Elan's complaint, alleging that the 550 mg product it sought to market under its ANDA product would not infringe the '320 patent, that the '320 patent was invalid, and that the '320 patent was unenforceable on the basis of patent misuse. Andrx also counterclaimed for declaratory relief and damages, asserting the same grounds. *See* Pretrial Stipulation at Exh. 3 ¶ 99; Andrx's Answer, Affirmative Defenses, and Counterclaims [D.E. 4] (Nov. 13, 1998). Andrx's answer and counterclaim contained no allegations regarding unenforceability on the basis of inequitable conduct. *See* Pretrial Stipulation at Exh. 3 ¶ 100; Answer, Affirmative Defenses, and Counterclaims at 1–5. Elan replied to Andrx's counterclaim, denying all allega-

tions regarding non-infringement, patent invalidity, and patent misuse. *See* Pretrial Stipulation at Exh. 3 ¶ 101; Elan's Reply to Counterclaim [D.E. 7] (Dec. 7, 1998).

### 2. CASE NO. 00–7057—SECOND SUIT DIRECTED TO ANDRX'S 412.5 MG PRODUCT

On or about June 14, 2000, Elan received from Andrx a second Notice of Certification under 21 C.F.R. § 314.95, informing Elan of Andrx's amendment to its ANDA submission and corresponding certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), in which Andrx sought FDA approval to market a 412.5 mg lower dosage strength version of the 550 mg product that was the subject of Andrx's initial ANDA filing. *See* Plaintiff's Exh. 322 at Ex. B. Like Andrx's first Certification Notice, Andrx's second Certification Notice directed to Andrx's version of Elan's 412.5 mg product did not contain any allegations as to the validity or enforceability of the '320 patent. *See* Plaintiff's Exh. 322 at Ex. B.

On July 26, 2000, Elan filed the second action, Case No. 00–7057, asserting that Andrx's amendment to its ANDA constituted an act of patent infringement. Several weeks later, Andrx answered Elan's complaint, alleging that the 412.5 mg product it sought to market under its ANDA amendment would not infringe the '320 patent, that the '320 patent was invalid, and that the '320 patent was unenforceable on the basis of inequitable conduct and patent misuse. Andrx also counterclaimed for declaratory relief and damages, asserting the same grounds. *See* Answer, Affirmative Defenses, and Counterclaims [D.E. 5 in Case No. 00–7057] (Aug. 21, 2000). Elan subsequently replied to Andrx's counterclaim denying all allegations regarding non-infringement, patent invalidity, and unenforceability. *See* Reply to

Counterclaims [D.E. 6 in Case No. 00–7057] (Sept. 7, 2000).

### 3. THE CONSOLIDATION OF THE TWO ACTIONS

The two cases were consolidated on the parties' joint motion. *See* Order Granting Joint Motion for Consolidation and Re-Setting Trial Date [D.E. 151 in Case No. 98–7164; D.E. 12 in Case No. 00–7057] (Oct. 10, 2000). After consolidation, I dismissed Andrx's affirmative defense and counterclaim in the consolidated actions directed to alleged patent misuse. *See* Order [D.E. 178 in Case No. 98–7164; D.E. 37 in Case No. 00–7057] (Jan. 24, 2001). I also granted Andrx's motion to amend its pleadings in Case No. 98–7164 to add an affirmative defense and counterclaim alleging unenforceability of the '320 patent on the basis of alleged inequitable conduct. *See* Order [D.E. 185 in Case No. 98–7164; D.E. 44 in Case No. 00–7057] (Jan. 26, 2001).

The parties presented evidence at a bench trial from January 29, 2001, through February 14, 2001. They presented closing arguments on May 4, 2001, after submitting proposed findings of fact and conclusions of law.

### II. FINDINGS OF FACT

Because I find that Elan's '320 patent is invalid under 35 U.S.C. § 102(b), the following findings of fact are those which are relevant and necessary to the resolution of the "on-sale" issue. The factual predicates underlying the on-sale determination are essentially undisputed, and the parties' dispute focuses on the legal ramifications of the various documents that have been admitted into evidence.

#### A. ELAN'S TRADEMARK FILING (MAY 7, 1987)

On May 7, 1987, Elan filed a United States Trademark Application to protect the word mark "Naprelan." *See* Defendant's Exh. 13. The United States Trademark Registration for Naprelan® issued to Elan covered the following: "pharmaceutical and veterinary preparations and substances, namely, anti-inflammatory, analgesic and antipyretic drugs" in International Class 5. *Id.*

#### B. ELAN'S LETTER TO LEDERLE LABORATORIES (AUGUST 7, 1987)

In August of 1987, Kenneth E. McVey served as the Executive Vice President for Business Planning and Commercial Development at Elan. *See* Defendant's Exh. 54 at 39. During that same time frame, K. Michael Forrest was a Vice President for Lederle Laboratories, and had the responsibility for domestic operations, marketing, and sales. *See* Deposition of K. Michael Forrest at 6 (Jan. 28, 2000). In a letter dated August 7, 1987, Mr. McVey wrote the following letter to Mr. Forrest:

It was a pleasure to meet you and your colleagues on August 5, and I hope you found our discussions on naproxen ... of interest.

With regard to naproxen, I would like to confirm to you our licensing and development plans for our once daily tablet aimed at a launch in the U.S.A. by the patent expiry [sic] date. On product development, we plan to be in a position to file an I.N.D. by early 1988, and believe that we will need a clinical program involving enrollment of 500 patients and running for up to two years to generate the necessary data for N.D.A. filing.

On the licensing side, we are actively seeking a partner and believe Lederle's marketing strengths make you ideal in this respect. Ideally, we want to have our partner determined this year so that they can actively participate in the planning of the clinical studies, even though Elan would remain responsible for conducting them.

As I indicated to you, we see any license as involving two types of payment—a licensing fee in the form of recoverable advance royalties and a charge for the clinical program as patients become enrolled. On the former, the total licensing fee would be $2.75 million dollars, payable:

 (i) $500,000 on contract signature,

 (ii) $500,000 on I.N.D. filing,

 (iii) $750,000 on N.D.A. filing, and

 (iv) $1,000,000 on N.D.A. approval,

all recoverable against a 5% running royalty by withholding one-third of each payment due.

On the clinical side, we would ask for a payment of $250,000 upon enrollment of each 50 new patients, up to a maximum of $2.5 million dollars.

*Finally, I would confirm that we would take responsibility for supplying bulk tablets with our objective being to achieve a price structure allowing you an initial gross margin based on current naproxen prices of not less than 70% after taking into account our processing charge (at current exchange rates, around $60 ÷ 1000 × 500 mg tablets, excluding A.I. cost), A.I. cost, packaging and royalty.*

As I mentioned above, we would value having Lederle as a partner in this project, and I look forward to having your decision in this matter and more detailed discussions on the contract in the near future.

With regard to [redacted] I plan to send Peter Etzel a sample or the roam for your assessment and, at that time, I will also give you our licensing proposals.

Defendant's Exh. 60 (emphasis added).

Elan does not dispute that this letter was sent, but rather takes issue with Andrx's contention that it constitutes an offer for sale within the purview of § 102(b). The parties raise a number of arguments pertaining to this letter, each of which will be discussed in turn.

### C. ELAN'S LETTER TO SCHERING LABORATORIES (MARCH 28, 1988)

On March 28, 1988, Seamus Mulligan, Elan's Vice President of U.S. Operations, wrote to Steven Schneider, the Senior Vice President of Marketing Operations for Schering Laboratories in Kenilworth, New Jersey. The letter concerned various Elan products available for licensing in the United States:

I would like to thank you for taking the time to meet with the Elan delegation on Tuesday the 15th. We appreciated the effort you made in ensuring that all the key representatives were present from Schering's side. As agreed at that meeting, I have attached a listing of products available for licensing in the United States. To remind you the development status reads as follows:

Stage 1: Initial product development completed with a bioavailability study illustrating product performance in vivo.

Stage 2: Optimization of formulation and development of final product.

Stage 3: Preparation of Registration dossier.

In the case of capsule or liquid dosage forms, the unit dose can be altered to suit your requirements, for our tablet products a number of strengths may be available depending on the formulation of interest.

When you have completed your review of this list, please notify me of the specific products of interest to you. I will then draft a suitable secrecy agreement covering exchange of information for these products.

I also look forward to the opportunity to discuss further with your technical staff

and yourself the possibility of using Elan's technology to develop new formulations in the OTC/Rx area, the timing of such a meeting is a matter for yourself.

If you have any questions about the product list such as pharmacokinetic performance, regulatory status, etc. please contact me.

Defendant's Exh. 39. The attachment to the letter indicated that Elan's 24 hour naproxen tablet was in stage three of development, which means that a registration dossier was being prepared for the product. *See id.* As noted in the letter, Elan's 24 hour naproxen tablet was available for licensing in the United States. *See id.*

### D. ELAN'S MEMORANDUM CONCERNING WARNER LAMBERT'S INTEREST (MAY 12, 1988)

In 1988, Peter Gray was the Executive Vice President of Irish Operations and the Chief Financial Officer for Elan. *See* Defendant's Exh. 54 at 39. During that same time frame, John Devane served as the Vice President of Product Development and Product Management for Elan. *See id.* at 38. In a May 12, 1988, memorandum to Mr. Devane, Mr. Gray wrote that Warner Lambert was "interested in [Elan's] nonsteriodals including . . . naproxen," *id.*, and that Warner Chilcott was also interested but did not have any funds. Defendant's Exh. 62.

### E. ELAN'S LETTER TO WYETH AYERST LABORATORIES (MAY 23, 1988)

In May of 1988, Frank Corcoran was the Director of Marketing of New Products for Wyeth Ayerst Laboratories in Philadelphia, Pennsylvania. *See* Defendant's Exh. 12 at E2 072943–44; Defendant's Exh. 38 at E2 072967–68. On May 23, 1988, Kenneth McVey, Elan's Executive Vice President, wrote a letter to Mr. Corcoran which stated the following:

It was a pleasure to meet you again on May 16 and I certainly enjoyed our discussions regarding the new structure of Wyeth Ayerst and how you saw their needs in connection with new products in the near to medium term.

From what you told me, I believe that the most likely products of interest to you would be the following:

. . . . .

3) Naproxen—*We have completed the development of a once daily dosage form comprising multiparticulate controlled release product incorporated in a scored tablet.* The U.K. registration file for this product has already been lodged with the CSM and the file includes not only biopharmaceutics data but also tolerance and acceptability data generated in elderly patients. We believe this type of product would require clinical work to be carried out in the United States since no other long acting Naproxen products are available in this market and it would be our plan to find a partner with the product at its present stage of development and collaborate with that partner in the necessary clinical work and filing of the required NDA. In view of the Syntex patent protection on this product extending out until late 1993, I also indicated that this was an appropriate time to start the clinical registration program since, with current FDA delays in reviewing this type of NDA, extending up to three years, it could certainly take until 1993 to get the required approvals.

. . . . .

From our discussion, I understood that you would raise certain of these product opportunities with your new product planning committee and that, if in concept any were of interest, you would get back in touch with me for further discussion on these subjects. I therefore hope

to hear from you in the not too distant future regarding these matters.

Defendant's Exh. 12 (emphasis added).

Andrx contends that sometime after May of 1988, Elan entered into an agreement with Wyeth Ayerst Laboratories in which Elan would manufacture and supply Wyeth Ayerst with Naprelan® tablets for distribution and sale by Wyeth Ayerst in the United States. *See* Andrx's Post Trial Findings of Fact and Conclusions of Law ¶ 47 [D.E. 212] (March 12, 2001). In support of this assertion, Andrx introduced into evidence a photocopy of a Naprelan pill bottle. *See* Defendant's Exh. 160. Other than identifying the product, dosage, and quantity, the exhibit does not identify where the product came from, when it was manufactured, sold, or distributed, or who was responsible for its manufacture, sale, or distribution. Accordingly, Andrx's contention on this matter is unsupported by the evidence.

### F. ELAN'S SCRIP ADVERTISEMENT (JUNE 22, 1988)

On June 22, 1988, Elan placed an advertisement in SCRIP World Pharmaceutical News for Naprelan®, the once daily naproxen sodium formulation that falls within the scope of the claims of the '320 patent. *See* Pretrial Stipulation at Exh. 3 ¶¶ 9, 16. The advertisement stated, in relevant part, as follows:

> Elan Corporation announces completion of the first ONCE DAILY formulation of NAPROXEN. This unique product, developed using Elan's SODAS® HC technology, provides: Reduced gastric irritation and improved tolerability demonstrated in clinical trials ... Safe multiparticulate form in convenient scored tablet ... Complete registration pack-

age available and already filed in UK and Ireland.

Defendant's Exh. 53 at 7. SCRIP World Pharmaceutical News is published in Great Britain, and is available worldwide. *See id.* at 2. This issue of SCRIP noted that the subscription price for North America was $560, and that interested parties should contact either the Head Office or the U.S. Office to start a subscription. *See* Pretrial Stipulation at Exh. 3 ¶ 101. The SCRIP publication provided a U.S. address in New York, New York, and noted that subscription payments could be sent to that address. *See* Defendant's Exh. 53.

The SCRIP publication containing Elan's advertisement was available in the United States on or about June of 1988. *See* Defendant's Exh. 208. The SCRIP publication containing the Naprelan® advertisement was in the possession of a number of U.S. entities, including Syntex Pharmaceuticals in Polo Alto, California, *see* Defendant's Exh. 121, the Science Library at the University of Texas at Austin, *see* Defendant's Exh. 122, and the Pharmacy Library at the University of Wisconsin – Madison, *see* Defendant's Exh. 123. The libraries at the University of Texas and the University of Wisconsin had the SCRIP publication available to the public. *See* Defendant's Exh. 122, 123.

### G. THE DRAFT AGREEMENT BETWEEN ELAN AND WARNER–LAMBERT (SEPTEMBER OF 1988)

Andrx offered into evidence a draft agreement between Elan and Warner–Lambert. *See* Plaintiff's Exh. 256.[3] Under the terms of the proposed licensing agreement, Elan would retain all propriety interests in the subject trademarks and patent rights, but would grant to Warner

---

**3.** Pages 11 and 12 of the draft agreement are missing in all versions of the document submitted by the parties.

Lambert a license to prepare, use, and sell a particular product in a specified territory. *See id.* Art. II ¶ 1. The product in question is a solid oral Drug Specific Dosage Form (DSDF) developed by Elan containing the active ingredient "Naproxen Base, Naproxen Sodium and any other pharmaceutically acceptable salt of Naproxen," *id.* Art. I, ¶ 6, as the sole pharmaceutical active ingredient, *see id.* Art. I ¶ 1. The "CURRENTLY DEVELOPED DSDF" means the DSDF which Elan has developed as of the date specified, and which meets the specifications of Appendix B in the agreement. *Id.* Art. I ¶ 2. Warner Lambert would obtain an exclusive license to prepare, use, and sell the particular product in "all countries of Western Europe (except the United Kingdom, and Ireland), Australia, Canada, New Zealand and South Africa." *Id.* Art. I, ¶ 8(a). Warner Lambert would be granted a semi-exclusive license in the Mid–East countries, the countries of Central America, the islands in the Caribbean Sea (except Puerto Rico and the Virgin Islands), the countries in South America, and islands in the South East Asia. *See id.* Art. I ¶ 8(b). Under the terms of the agreement, a semi-exclusive license meant that the license would be exclusive except as to Elan itself, which retained the right to sell the product in the territories in question, or to grant a nontransferable license for another entity to sell the product in the territories in question. *See id.* Art. II, ¶ 1.

Article III of the proposed naproxen agreement stated that "ELAN shall produce and supply to THE CLIENT its entire requirements of the CURRENTLY DEVELOPED DSDF at prices developed pursuant to ARTICLE IV, paragraph 5," subject to certain requirements. *Id.* Art. III ¶ 1.1. In consideration for the grant of rights in the license, Warner Lambert would pay Elan $250,000 in U.S. dollars upon signature of the agreement, *see id.* Art. IV ¶ 1.2., and $250,000 on first approv-

al in Italy, France, Spain or Canada, *see id.* Art. IV ¶ 1.2. Under the terms of the proposed agreement, Warner Lambert would be obligated to ensure that, in each country of the specified territories, the label of the product disclose that the product is manufactured by or licensed by Elan to the extent that such disclosures are required by the laws of the country at issue. *See id.* Art. II ¶ 2.

## H. ELAN'S 1988 ANNUAL REPORT

Elan's 1998 Annual Report disclosed that it was preparing an IND in the United States for further clinical studies on its once-daily naproxen product. *See* Defendant's Exh. 54 at 2. Additionally, Elan described its SODAS (Solid Oral Drug Absorption System) and SODAS–HC drug delivery technology. *See id.* at 4–6. This drug delivery technology is the same type of technology that is described in the '320 patent, *see* Testimony of Eugene Rzucidlo, Trial Transcript at 1242–43 (Feb. 7, 2001), and mentioned in the SCRIP advertisement.

## I. ELAN'S TELEFAX TO WARNER LAMBERT (SEPTEMBER 22, 1988)

On September 22, 1988, Patrick Ashe, Elan's Manager of Commercial Development, sent John Kindschi of Warner Lambert the composition and manufacturing specifications for Elan's once-daily naproxen product, as well as draft examples 1 and 2 from the once-daily naproxen patent applications that were being prepared for international filings. *See* Defendant's Exh. 57. The information contained in the letter on the composition and manufacturing is the information contained in Example 1 of the '320 patent. *See* Defendant's Exh. 57 at E1 079363–64; Defendant's Exh. 2 at col. 7–8; Rzucidlo Testimony, Trial Transcript at 1236; Deposition of

Seamus Mulligan at 256–267 (December 15, 1999).

## J. THE "KELLY" ARTICLE

Andrx offered into evidence an article entitled "Pharmacokinetic Properties and Clinical Efficacy of Once-daily Sustained Release Naproxen," authored by J.G. Kelly, C.D. Kinney, J.G. Devane, S. Mulligan, and B.V. Colgan, and published in 1989 in the European Journal of Clinical Pharmacology. *See* Defendant's Exh. 10. One of the article's co-authors, Seamus Mulligan, is one of the co-inventors of Elan's '320 patent. *See* Pretrial Stipulation at Exh. 3 ¶ 22; Deposition of Seamus Mulligan at 67–68 (Oct. 19, 1999).

The Kelly article tested a "compressed multiparticulate tablet form" of naproxen. Defendant's Exh. 10 at 383. Figure 2 of the Kelly article is the same as Figure 1 of the '320 patent. *See* Defendant's Exh. 10 at Fig. 2; Defendant's Exh. 2 at Fig. 1; Mulligan Dep. at 72–74. Likewise, the test data reported in the Kelly article, *see* Defendant's Exh. 10 at 386, is the same or substantially the same as that which appears in the '320 patent, *see* Defendant's Exh. 2 at col. 15, line 15 to col. 16, line 26. *See also* Mulligan Dep. at 72–83; Rhodes Testimony, Trial Transcript at 648–49; Rzucidlo Testimony, Trial Transcript at 1298–99. Hence, the test data in the '320 patent was available at least as early as October 10, 1988, when the Kelly article was submitted for publication. *See* Defendant's Exh. 10 at 388.

## III. THE "ON-SALE" BAR UNDER 35 U.S.C. § 102(B)

A patent is considered presumptively valid. *See* 35 U.S.C. § 282. Nevertheless, "[a]n inventor loses his right to a patent if he has placed his invention 'in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.' " *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566 (Fed.Cir. 1995) (citing 35 U.S.C. § 102(b)).[4] It is undisputed that the '320 patent was filed with the United States Patent and Trademark Office on January 14, 1991. *See* Pretrial Stipulation ¶ 18. Consequently, the critical date for determining the applicability of the on-sale bar is January 14, 1990, *see Preemption Devices, Inc. v. Minn. Mining and Mfg. Co.*, 732 F.2d 903, 905–06 (Fed.Cir.1984) (defining the phrase "critical date"), and a sale or offer to sell the patented invention on or before that date may invalidate the patent.

In *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), the U.S. Supreme Court articulated the standard for determining the applicability of the on-sale bar:

First, the product must be the subject of a commercial offer for sale. An inventor can both understand and control the timing of the first commercial marketing of his invention.

. . . . .

■ Second, the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

Under Federal Circuit precedent, whether an invention was on sale within the mean-

4. A person shall be entitled to a patent unless—

 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(b).

ing of § 102(b) is a question of law, based upon the underlying facts. *See Ferag AG,* 45 F.3d at 1566.

■ A party challenging the validity of a patent under § 102(b) must prove its case by a clear and convincing evidence. *See Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1045–46 (Fed.Cir. 2001). "The 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). Stated differently, clear and convincing evidence is proof which "could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico,* 467 U.S. 310, 316–17, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

■ The on-sale bar is driven by the various public policies underlying its enactment: (1) preventing removal of "inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity"; (2) promoting "prompt and widespread disclosure of new inventions to the public"; (3) preventing "the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized" term; and (4) giving "the inventor a reasonable amount of time following sales activity ... to determine whether a patent is a worthwhile investment." *UMC Elecs. Co. v. United States,* 816 F.2d 647, 653 (Fed.Cir.1987) (citations omitted). First and foremost, however, is the policy of "preventing inventors from reaping the benefits of the patent system beyond the statutory term." *Ferag AG,* 45 F.3d at 1567–68.

Prior to the Supreme Court's decision in *Pfaff,* the accepted approach was to consider "[a]ll of the circumstances surrounding

the sale or offer to sell, including the stage of development of the invention and the nature of the invention, ... weighed against the policies underlying [§ ] 102(b)." *UMC Elecs. Co.,* 816 F.2d at 656. In light of *Pfaff,* however, it is clear that the so-called "totality of the circumstances" test has been displaced by a more concrete formulation—a commercial offer for sale. *See Brasseler, U.S.A. I, L.P.,* 182 F.3d 888, 890 (Fed.Cir.1999).

■ A single sale or offer to sell may be sufficient to invoke the § 102(b) bar. *See A.B. Chance Co. v. RTE Corp.,* 854 F.2d 1307, 1311 (Fed.Cir.1988) ("A single offer to sell is enough to bar patentability whether or not the offer is accepted."); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1188 (Fed.Cir. 1993) ("Even a single sale outside the grace period may be sufficient to invoke [§ ] 102(b)."). In this case, Andrx does not contend that any actual sales of an embodiment of the '320 patent were made. As a result, the operative inquiry under the first prong of *Pfaff* is whether or not Elan made a commercial offer for sale of the invention at issue.

### A. THE FIRST *PFAFF* PRONG— "COMMERCIAL OFFER FOR SALE"

The Federal Circuit has interpreted *Pfaff* to mean that a formal offer, in a contract sense, is necessary for invocation of the on-sale bar. *See Scaltech, Inc. v. Retec/Tetra, LLC,* 269 F.3d 1321, 1328 (Fed.Cir.2001) ("To determine if the offer is sufficiently definite, one must examine the language of a proposal in accordance with the principles of general contract law."); *Group One, Ltd.,* 254 F.3d at 1048 ("Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming

consideration), constitutes an offer for sale under § 102(b)."). Indeed, "commercialization is the central focus for determining whether the patented invention has been placed on sale." *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 71 F.3d 1573, 1577 (Fed.Cir.1995) (holding that a sale made as a special deal in an attempt to satisfy the requirements of a licensing agreement was a sham, and hence not a sale within the meaning of § 102(b)).

It will not "always be easy to ascertain whether a set of interactions between parties constitutes a commercial offer to sell." *Group One, Ltd.*, 254 F.3d at 1048.[5] As a general matter, "[l]anguage suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.'" *Id.* Courts should "look to the Uniform Commercial Code ("UCC") to define whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Id.* at 1047. Unfortunately, the Uniform Commercial Code "does not define 'offer,' and courts must resort to extra-Code contract law via [§ ] 1–103 to determine whether a party has made an offer." 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1–4 (4th ed.1995). Consequently, I look elsewhere for guidance as to whether or not a commercial offer for sale was made. As the Federal Circuit has noted, "there is a substantial body of general contract law, widely shared by both state and federal courts, to which courts can resort in making these determinations." *Group One, Ltd.*, 254 F.3d at 1048.

Each of the sources I have consulted defines an offer in a similar manner. For starters, the Restatement of Contracts defines an offer as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981). Another influential source, Corbin on Contracts, defines an offer as "an expression by one party of assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express assent to the same terms." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.11 (1964). Yet another treatise, Williston on Contracts, defines an offer as "a conditional promise dependent for its enforceability on the offeree giving in exchange the offeror's requested act, forbearance or return promise; or alternatively, the offeror's manifestation of willingness to enter into a proposed bargain communicated in such a manner that the offeree may understand that by assenting the bargain will be concluded." SAMUEL WILLISTON, WILLISTON ON

---

5. In the context analyzing personal jurisdiction, the Federal Circuit has held than an "offer to sell" has been made "where the defendant manufacturer had communicated to prospective buyers both a description of the product and 'a price at which it can be purchased.'" *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1308 (Fed.Cir.1999). One Federal Circuit decision has noted that an "offer to sell" under 35 U.S.C. § 271, which pertains to personal jurisdiction, "cannot be treated as equivalent to 'on sale' under § 102(b)," because of the differing policy reasons underlying each statutory provision. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 n. 4 (Fed.Cir.1998). Yet a more recent Federal Circuit decision disagrees with *3D Sys.* and holds that "the analysis of an 'offer to sell' under § 271(a) is consistent with the Court's analysis in *Pfaff* of § 102(b)." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254 (Fed.Cir.2000) ("This analysis is not divergent from our § 271(a) analysis, because an offer for sale, whether made before or after a patent is applied for, or after it is granted, requires no more than a commercial offer for sale."). I agree with *Rotec* on this point and will look to guidance from cases interpreting § 271 as well.

CONTRACTS § 4:4 (4th ed.1990). The question is whether the putative offeree could have accepted the offer. *See* RESTATEMENT (SECOND) OF CONTRACTS § 24 cmt. a, Reporter's Note ("[T]he key concept involves giving the addressee the apparent power to conclude a contract without further action by the other party....") (citations omitted); CORBIN ON CONTRACTS § 1.11 ("[T]he best short description ... is that an offer creates a power of acceptance in the offeree. With respect to the resulting legal relations, offer and acceptance may be defined thus: An *offer* is an act whereby one person gives to another the legal power of creating the relation called contract. An *acceptance* is the exercise of the power conferred by the offer, by the performance of some other act or acts."); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.3 (2d ed. 1998) ("Empowerment of the offeree to make the offeror's promise enforceable is thus the essence of an offer."). *Cf. Zacharin v. United States,* 213 F.3d 1366, 1370 (Fed.Cir.2000) ("A sale is 'a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.' ").

The question of whether the putative offeree could have accepted the proposal is viewed from an objective perspective. *See* CORBIN ON CONTRACTS § 1.11 (noting that in order to constitute a legal offer, the expression of the offeror "must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred"); FARNSWORTH ON CONTRACTS § 3.10 ("Conduct that would lead a reasonable person in the other party's position to infer a promise in return for performance or promise may amount to an offer."). In order to constitute an offer, the proposal must contain all of the essential terms of the proposed agreement. *See* CORBIN ON CONTRACTS § 1.11 ("In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall

contain all the terms of the contract to be made."); WILLISTON ON CONTRACTS § 4:4 ("[A]n offer must state with the same certainty the act or promise which the offeror agrees to take in return for his promise if the offeree accepts."); FARNSWORTH ON CONTRACTS § 3.3 ("The fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not.").

Stated differently, the issue in this case is whether Elan's so-called "licensing" proposals would have led a reasonable recipient to conclude that it had the power to accept the proposal in question, and whether all of the essential terms of the agreement were included. Andrx points to a number of documents in support of its assertion that the Elan patent is invalid because of the on-sale bar.

### 1. THE TRADEMARK FILING AND SCRIP ADVERTISEMENT

█ Elan's trademark filing for the mark Naprelan® is insufficient to invoke the on-sale bar. The trademark filing pertains to the use of the mark, not the sale or offer to sell the invention or an embodiment thereof. *See Preemption Devices, Inc.,* 732 F.2d at 906 ("We find particularly unconvincing its argument based on the declaration filed in connection with the application to register the trademark OPTICOM, stating the dates of first use and first use in commerce. Those statements were not made with respect to the use of the invention but the use of the mark.").

█ Likewise, I do not believe that the SCRIP advertisement constitutes a commercial offer for sale. *See Group One, Ltd.,* 254 F.3d at 1048 ("We do note in passing that contract law traditionally recognizes that mere advertising and promoting of a product maybe nothing more than an invitation for offers, while responding to such an invitation may itself be an offer."); *Teradyne, Inc. v. Hewlett–Packard Co.,*

No. C–91–0344–MHP, 1994 WL 317527, at *5 (N.D.Cal. June 21, 1994) (holding that a publication in *Electronics Magazine* which briefly described the subject matter of the invention, cited a target price, and noted that the invention "may be ready this fall" did not constitute a definite offer to sell). *See also* WILLISTON ON CONTRACTS § 4:7 ("[T]he courts routinely hold that … advertisements or other expressions of intention are invitations to soliciting offers or to enter into a bargain rather than offers themselves."). Nevertheless, the information contained in the advertisement is certainly relevant to the on-sale calculus. In particular, Elan used the SCRIP advertisement to "announce[ ] the *completion* of the first ONCE DAILY formulation of NAPROXEN." Defendant's Exh. 53 at 7 (emphasis added). As discussed below, this pronouncement is relevant to the second component of the on-sale bar, as articulated by the Supreme Court in *Pfaff.*

## 2. THE SO-CALLED "LICENSING" DOCUMENTS

■ Andrx argues that the "licensing" related documents introduced into evidence trigger the on-sale bar. *See* Defendant's Exh. 12, 38, 39, 60, 62, 160; Plaintiff's Exh. 256. Elan counters that these agreements amount to offers to license the patent itself, rather than offers to license or sell the invention. Federal Circuit precedent holds that "a sale of rights in a patent, as distinct from a sale of the invention itself, is not within the scope of the statute, and thus does not implicate the on-sale bar." *Group One, Ltd.,* 254 F.3d at 1049. *See also Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1267 (Fed.Cir. 1986) ("[A]n assignment or sale of the rights in the invention and potential patent rights is not a sale of 'the invention' within the meaning of [§ ] 102(b)."); *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1216 (Fed.Cir.1998) (same). Indeed, "[t]he option to sell the rights under the

patent as distinct from the sale of any article, device or composition embodying the invention or capable of performing the invention does not constitute an 'on sale' bar." *Scott Paper Co. v. Moore Bus. Forms, Inc.,* 594 F.Supp. 1051, 1075 (D.Del.1984) (citations omitted).

In its August 7, 1987, letter to Lederle Laboratories, Elan offered an embodiment of its patent for sale. *See* Defendant's Exh. 60 ("I would confirm that we would take responsibility for supplying bulk tablets.…"). *Cf. C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1381 (Fed.Cir.1998) (Bryson, J., concurring in part) ("The offer of such large quantities … was clearly for commercial, rather than experimental, purposes.…"). The letter, which was written more than two years prior to the critical date, contained all the indicia of a typical commercial offer. *See HollyAnne Corp.,* 199 F.3d at 1310 (noting that the typical hallmarks of a commercial transaction may include a quotation of a price and a product description, or a communication that the item was available for purchase). Price terms were quoted ("around $60÷1000 × 500 mg tablets"), as were proposed licensing fees to be paid by Lederle, and a proposed profit margin that Lederle could expect if it entered into the transaction ("[O]ur objective [is] to achieve a price structure allowing you an initial gross margin based on current naproxen prices of not less than 70% after taking into account our processing charge … A.I. cost, packaging, and royalty."). *See 3D Sys., Inc.,* 160 F.3d at 1379 ("As a matter of federal statutory construction, the price quotation letters can be regarded as 'offer[s] to sell' under § 271 based on the substance conveyed in the letters, *i.e.,* a description of the allegedly infringing merchandise and the price at which it can be purchased."). Applying an objective standard, Lederle could certainly have accepted Elan's proposal, thus leading to the

inexorable conclusion that the letter constitutes a commercial offer for sale. Indeed, Elan's Mr. McVey wrote in the letter he "look[ed] forward to having [Lederle's] decision in this matter and more detailed discussions on the *contract* in the near future." Defendant's Exh. 60 (emphasis added).

The mere fact that Elan would retain "ownership rights in the invention when an embodiment thereof was [offered for sale] to [the buyer] in large quantity for resale" does not change the nature of the underlying offer. *Brasseler, U.S.A. I, L.P.,* 182 F.3d at 891. Simply couching the offer as a "licensing" proposal does not avoid the impact of the on-sale bar where an offer was made to sell a physical embodiment of the invention more than one year prior to the critical date. *See Group One, Ltd.,* 254 F.3d at 1049 n. 2 ("Of course, a sale of an interest that entities the purchaser to possession and use of the machine, unrelated to any patent present or future, could be couched as a 'license'; such labeling would not prevent the transaction from triggering the on-sale bar, all other requirements being met."); *3D Sys., Inc.,* 160 F.3d at 1379 ("The price quotation letters ... state on their face that they are purportedly not offers, but to treat them as anything other than offers to sell would be to exalt form over substance."). *Cf. TRW Fin. Sys., Inc. v. Unisys Corp.,* 835 F.Supp. 994, 1004 n. 17 (E.D.Mich.1993) ("To the extent that TRW relies upon the labeling of the Teknekron/Crocker Bank Agreement as a 'developmental' or 'services' contract, such labels are not determinative of the issue of whether a product was or was not actually offered for commercial sale.").

I have considered the opinion testimony presented by Elan in support of its argument that the Lederle letter was a licensing proposal, *see* Trial Testimony of Joseph Colaianni, Trial Transcript at 1770–71 (Feb. 13, 2001), and the similar description of the letter by one of Andrx's witness, *see* Rzucidlo Testimony, Trial Transcript at 1238, 1334, but do not find those characterizations persuasive in light of the record evidence. This case clearly does not involve a situation "in which an individual inventor takes a design to a fabricator and pays the fabricator for its services in fabricating a few sample products." *Brasseler, U.S.A. I, L.P.,* 182 F.3d at 891. Under those circumstances, raising the on-sale bar would be inappropriate. But to treat Elan's August 7, 1987, letter "as anything other than [an] offer[ ] to sell would be to exalt form over substance." *3D Sys., Inc.,* 160 F.3d at 1379.

Elan argues that "[t]he portion of the August 7, 1987, letter stating that Elan 'would take responsibility for supplying bulk tablets ...' refers to the possibility of Elan supplying bulk tablets to Lederle Laboratories in the future *if* a product ultimately were ever approved by the FDA for public use in the United States." Elan's Proposed Findings of Fact and Conclusions of Law ¶ 191 [D.E. 215] (March 12, 2001). Yet the letter contains no such limitation. If Elan—a sophisticated business entity—would have intended such a limitation, it could simply have included one. *See Ferag AG,* 45 F.3d at 1568 ("The subjective, uncommunicated, and ultimate intention of the offeror, however clear, is not alone sufficient."). *Cf. U.S. Envtl. Prods., Inc. v. Westall,* 911 F.2d 713, 717 (Fed.Cir.1990) ("The subjective belief of inventors or customers ... must be weighed against objective evidence which indicates otherwise."). In essence, Elan's argument is that FDA approval was a condition precedent to the consummation of the contract. Assuming that such a condition precedent was in fact implicit for the enforceability of the contract, the existence of that condition does not vitiate the fact that an offer was made.

It is undisputed that, at the time of this letter, Elan had not yet applied for FDA approval of its once-daily naproxen sodium product in the United States. *See* Pretrial Stipulation at Exh. 3 ¶ 10. Indeed, Mr. McVey noted in the letter that clinical testing in the United States was necessary in order to obtain FDA approval. *See* Defendant's Exh. 60 at 1 ¶ 2. Elan therefore argues that the letter was not an offer for sale because Elan could not have legally promoted or commercially distributed Naprelan® or any other embodiment of the '320 patent in the United States during this period, as there was no NDA, ANDA, or IND covering any such product. *See* Elan's Proposed Findings of Fact and Conclusions of Law ¶ 215 (citing 21 U.S.C. § 355(a), (i); 21 C.F.R. §§ 312.2, 312.3, 312.7, 312.20–.38). Moreover, Syntex Corporation owned U.S.Patent No. 3,998,966 for naproxen, the active ingredient in Naprelan®, and this patent did not expire until 1993. *See* Plaintiff's Exh. 332 at 1; Rhodes Testimony, Trial Transcript at 1951. Elan contends that the Syntex patent for naproxen prevented it from commercially marketing the subject matter of the '320 patent until at least 1993, which is approximately five years after the letter was sent to Lederle. *See* Elan's Proposed Findings of Fact and Conclusions of Law ¶ 216. Hence, Elan asserts that because it could not have commercially marketed the subject matter of the '320 patent for at least five years, the Lederle letter was at most a "preparation for a sale," which could not raise the on-sale bar. *See id.* ¶¶ 217–220.

The terms of the proposal—as noted in Elan's letter to Lederle—belie these assertions. Specifically, the terms of the proposal request, among other things, a $500,000 payment due on the signing of the contract. *See* Defendant's Exh. 60 at 1. Additional payments were also proposed: $500,000 on IND filing; $750,000 on NDA filing; and $1,000,000 on NDA

approval. *See id.* And, as noted above, the letter confirmed that Elan would be responsible for supplying bulk tablets (*i.e.*, an embodiment of the patented invention) at a proposed price. *See id.* at 2. Elan therefore offered to sell an embodiment of the invention prior to any IND filing. *See id.* at 1 ("[W]e plan to be in a position to file an I.N.D. by early 1988 . . . .").

As the Federal Circuit has aptly noted, "the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of the [§ ] 102(b) bar." *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1452 (Fed.Cir.1997); *C.R. Bard, Inc.*, 157 F.3d at 1377 (Mayer, C.J., concurring in part) ("Even an illegal sale of the claimed invention before the critical date can bar patent rights."). Elan therefore properly conceded during closing argument that the legality of an offer does not affect the applicability of the on-sale bar. *See* Trial Transcript at 1708–09. In any event, 35 U.S.C. § 271(e) declares that it is not an act of infringement to sell or offer to sell a patented invention solely for purposes related to the development and submission of information under the federal drug laws. *See Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1376 n. 4 (11th Cir.1988) (noting that Congress enacted § 271(e) to permit generic drug manufacturers to conduct clinical trials necessary for FDA approval before the branded drug patent expired without risking liability for patent infringement). In this case, the Lederle letter falls squarely within the scope of the § 271(e) exemption: Elan was seeking a partner who would actively participate in a clinical program which was necessary "to generate the necessary data for N.D.A. filing." Defendant's Exhibit 60. Likewise, 21 C.F.R. § 312.160 provides a procedure by which Elan could have sold its product for laboratory research purposes. Consequently, the fact that the Syntex patent had not yet expired, or the fact that

the FDA had not yet granted approval for the drug, are insufficient to for Elan to escape from the on-sale bar. *See C.R. Bard, Inc.,* 157 F.3d at 1376 (Mayer, C.J., concurring in part) ("Clinical testing is not required before a sale can bar patent rights. Nor can subsequent clinical testing excuse a prior sale, if what was offered for sale was the claimed invention. . . . Likewise, FDA approval is not required before a sale can bar patent rights."). *See also Zacharin,* 213 F.3d at 1370 ("The fact that the sale in question was made in the context of a research and development contract and that there was no fixed price set for the [invention] does not suffice to avoid the on-sale bar."); *Atl. Thermoplastics Co. v. Faytex Corp.,* 970 F.2d 834, 836 (Fed.Cir.1992) ("The on-sale bar invalidates a patent for an invention offered for sale, even though not ready for satisfactory commercial marketing.").

Contrary to Elan's assertion, I do not believe that the Lederle letter was a "mere preparation for a sale." *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 830 (Fed.Cir.1991) ("It is not a violation of the on-sale bar to make preparations for the sale of a claimed invention—an actual sale or offer to sell must be proved."). Rather, letter constitutes a commercial offer for sale, one which Lederle could have accepted, even though Elan indicated it would be open to further negotiations. *See Scaltech,* 269 F.3d at 1328–29 (patentee's offer to process oily sludges and accompanying formal documents—which provided a quotation and an offer that was "firm for 90 days"—triggered on-sale bar). *Cf. Evans Cooling Sys., Inc.,* 125 F.3d at 1452 ("[T]he fact that the contract was cancelable or changeable under certain circumstances does not mean that it does not evidence a definite offer for sale."). Furthermore,

the fact that the offer was made to a potential distributor, rather than an ultimate user, is insufficient to take the commercial offer outside the scope of § 102(b). *See In re Caveney,* 761 F.2d 671, 676 (Fed. Cir.1985) ("The mere fact that a product is delivered to a distributor does not exempt the transaction from 35 U.S.C. § 102(b)."). The "public," as contemplated by § 102(b) "is not limited to ultimate users of the product. . . ." *Brasseler, U.S.A. I, L.P.,* 182 F.3d at 891 (internal quotation marks and citations omitted). Consequently, Elan's characterization of the letter as a "licensing" proposal seeking partners does not vitiate the fact that it offered for sale an embodiment of the invention at issue. *See Group One, Ltd.,* 254 F.3d at 1049 n. 2. As a point of comparison, Elan's letter to Lederle went well beyond the solicitation of pricing information, publication of preliminary data sheets, and dissemination to customers of advertising and informational data by the patentee in *Linear Tech. Corp. v. Micrel, Inc.* 275 F.3d 1040, 1052 (Fed. Cir.2001), which the Federal Circuit held did not constitute a commercial offer for sale.

The remaining documents, though in and of themselves not sufficient to constitute commercial offers, provide valuable insight into Elan's attempts at commercializing its once-daily naproxen tablets. *See, e.g.,* Defendant's Exh. 12, 39, 62. *Cf. Sonoscan, Inc. v. Sonotek, Inc.,* 936 F.2d 1261, 1264 (Fed.Cir.1991) (reviewing post-critical date evidence to determine what was offered in pre-critical date offer). The similarities between the terms proposed in the letter to Lederle and the draft agreement between Elan and Warner Lambert further bolster the conclusion that the Lederle letter was, in fact, a commercial offer for sale.[6]

---

**6.** Andrx contends that the proposed agreement between Elan and Warner Lambert also constitutes an offer for sale of an embodiment

of Elan's patent. Elan argues that the geographical coverage of the agreement clearly excludes the United States, and hence the on-

First, both documents relate to so-called "licenses" for the distribution of Elan's once-daily naproxen tablets. Second, both documents call for initial payments to be made upon signing of the contracts, and call for further payments upon governmental approval. Third, both documents allow for recovery of the licensing fees by withholding up to 1/3 of the royalties due on the sales. Fourth, both documents provide for a 5% royalty. Fifth, and most importantly, both documents state that Elan would supply a physical embodiment of the naproxen product, rather than just license the rights to produce, sell, or manufacture the invention. *See Group One, Ltd.*, 254 F.3d at 1049 n. 2.

The letter to Lederle Laboratories quotes a price of $60 ÷ 1000 × 500 mg tablets, whereas the price terms of the Warner Lambert draft agreement are missing. *Cf. Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997) ("In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith. 'Mere negligence' in losing or destroying records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.' ").[7] By comparison to Elan's other so-called "licensing" documents, *see* Defendant's Exh. 54 and Plaintiff's Exh. 256, Elan's conception of the term "license" actually encompasses a license coupled with an offer for sale of an embodiment of the invention. *See Group One, Ltd.*, 254 F.3d at 1049 n. 2. The cases cited by Elan in support of its contention that mere "licensing" agreements are not sufficient to invoke the on-sale bar explicitly recognize that a sale or offer to sell an embodiment of the invention can implicate the bar. *See, e.g., Moleculon Research Corp.*, 793 F.2d at 1267 (upholding the district court's finding that there was no evidence in the record "that the parties contemplated the sale or transfer . . . of the single physical embodiment of the puzzle then in existence").

## B. THE SECOND *PFAFF* PRONG— "READY FOR PATENTING"

The second prong of the *Pfaff* test requires that the invention at issue must be ready for patenting. *See Pfaff*, 525 U.S. at 67, 119 S.Ct. 304. As noted above, that condition may be satisfied in at least

---

sale bar is not implicated. *See In re Caveney*, 761 F.2d at 676–77 (holding that under § 102(b), invention must be "on sale" in the United States). Andrx, on the other hand, argues that certain U.S. Trust Territories are included in the map attached to the agreement, and that therefore the agreement constitutes an offer for sale within the United States. Elan responds by noting that the proposed license only applies to countries in the defined territory, and that the U.S. Trust Territory is not a "country." In light of my ruling concerning the Lederle letter, I need not address this precise issue, but believe that the proposed agreement between Elan and Warner Lambert offers some highly revealing evidence of Elan's conception of the term "license." As noted by Judge Lourie in his additional remarks in *Group One, Ltd.*, 254 F.3d at 1052–53 (Lourie, J.), "[a] patent license, if it is non-exclusive, is an agreement to forbear from suit. If the license is exclusive, it may be tantamount to an assignment of the patent." Critically, "[a] license is analogous to granting or waiving rights under *the patent*, which is distinct from selling *the machine* covered by the patent." *Id.* at 1052. In this case, in light of the letter to Lederle and the proposed agreement with Warner Lambert, it is abundantly clear that Elan was offering for sale an embodiment of the patent (i.e., the tablets), and not just rights under the patent. *See id.*

7. I do not believe that there is any probative evidence to show that the absence of these pages is predicated upon bad faith. *See Bashir*, 119 F.3d at 931. Accordingly, I do not draw an adverse inference from the fact that the pages are missing, but merely recognize that they have not been introduced into evidence.

two ways: "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* Although Elan focuses primarily on the first prong of the *Pfaff* test, *see* Elan's Motion for Judgment on Partial Findings Pursuant to Fed.R.Civ.P. 52(c) at 4 [D.E. 202] (Feb. 13, 2001), I will analyze the second prong of the *Pfaff* test for purposes of clarity and completeness. *See Scaltech Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 1384 (Fed.Cir.1999) ("The district court must determine if the process offered for sale, in its normal use, inherently satisfies each claim limitation."). Although reduction to practice is not a necessary precondition to showing that an invention is complete, "reduction to practice ordinarily provides the best evidence" of completion. *Pfaff,* 525 U.S. at 66, 119 S.Ct. 304.

The question, then, is whether or not the subject matter of the commercial offer for sale was of a completed invention—that is, a completed formulation of the once-daily naproxen product. In other words, "[a]lthough even a single offer of sale before the critical date can be debilitating ... such a sale or offer of sale invalidates a patent only if there is identity between the product sold or offered for sale and the later-claimed invention." *Pharmacia, Inc. v. Frigitronics, Inc.,* 727 F.Supp. 710, 712 (D.Mass.1989). If an offer for sale more than a year before the filing of a patent application was "primarily for a bona fide experimental purpose to perfect the invention, rather than for commercial exploitation," then such an offer of sale may avoid the statutory bar. *See Paragon Podiatry Lab., Inc.,* 984 F.2d at 1185. Additionally, "[q]uotation of a sales price to a potential distributor of a product that is not available for sale and distribution does not of itself establish an on-sale bar." *C.R. Bard,*

*Inc.,* 157 F.3d at 1357 (Newman, J., dissenting). *See also Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 112 F.3d 1163, 1168 (Fed.Cir.1997) ("If mere discussions prior to the critical date, or even an agreement to develop and provide a device that had not yet been invented, developed, or completed were to be held to be a bar to patentability, then collaboration between inventors and customers would be greatly impeded."); *Cont'l Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1270 (Fed. Cir.1991) (holding that price terms set between collaborators in joint research is not an on-sale bar); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 622 (Fed.Cir.1985) ("The clear weight of authority is that a bare offer to sell does not ipso facto satisfy the 'on-sale' bar....").

Elan does not dispute that its once-daily naproxen product was completed at the time the offer to Lederle was made. Nor does Elan dispute that the product offered to Lederle is embodied in the claims of its patent. Rather, Elan says that its product was in development. *See Cont'l Can Co. USA, Inc.,* 948 F.2d at 1269 ("[T]he 'on sale' bar of § 102(b) does not arise simply because the intended customer was participating in development and testing.").

Certain factors should be considered in determining whether or not an invention falls within the "experimental testing" exception to the on-sale bar. *See C.R. Bard, Inc.,* 157 F.3d at 1380 (Bryson, J., concurring in part). These include "the amount of control the inventor exercised over the testing; the length of the test period; whether any payment was made; whether there was a secrecy obligation; whether progress records were kept; whether someone other than the inventor conducted the experiments; and the degree of commercial exploitation during the tests in relation to the purpose of the experimenta-

tion." *Id.* In this case, no evidence was introduced by either party regarding any experimentation conducted with the naproxen product.

Elan's letter to Lederle itself suggests that the offer was for its completed naproxen product. *See Scaltech Inc.*, 178 F.3d at 1383 ("The 'invention' which has been offered for sale must, of course, be something within the scope of the claim."). First, Elan's letter expressly identified its once-daily naproxen tablet as the product and 500 mg as the dosage that it was offering to Lederle. *See* Defendant's Exh. 60 at 1–2. *See also Scaltech, Inc.*, 178 F.3d at 1383 ("We note that there is no requirement that the offer specifically identify these limitations."). Second, the letter called for payments to be made immediately upon signing of the contract. Third, the proposed offer indicated Elan's intention of supplying its embodiment of the naproxen tablet in bulk, and clearly provided a price per unit of volume. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1334 (Fed.Cir.1998) (holding that an order of a commercial quantity of an invention before the critical date "show[s] that the invention was ready for patenting"); *C.R. Bard, Inc.*, 157 F.3d at 1381 (Bryson, J., concurring in part) ("The bulk purchase offer provides further evidence that the [relevant] sale was not for experimental purposes."). Fourth, the letter did not suggest that the product was unavailable at that point in time, or that it had been produced only for experimental purposes. *See Paragon Podiatry Lab., Inc.*, 984 F.2d at 1187. Fifth, the letter expressly noted that Elan would await Lederle's "decision in this matter and more detailed discussions on the contract *in the near future.*" Defendant's Exh. 60 (emphasis added). Other than an assertion that clinical testing would be necessary to generate data for an NDA filing, the letter provides no indication that the naproxen product was experimental or unavailable at the time. As noted earlier, the fact that clinical testing is necessary will not "excuse a prior sale, if what was offered for sale was the claimed invention." *C.R. Bard, Inc.*, 157 F.3d at 1376 (Mayer, C.J., concurring in part). Indeed, "[n]one of the objective evidence indicates that the [offer for] sale[ ] ... [was] for anything other than a primarily commercial purpose." *Paragon Podiatry Lab., Inc.*, 984 F.2d at 1188.[8]

Even if Elan's naproxen product was not fully developed at the time of the August 7, 1987, letter, the on-sale bar is still implicated. The Federal Circuit has held that "subsequent completion of an invention after the critical date does not relate back to the date of an earlier alleged offer of sale." *Robotic Vision Sys., Inc.*, 112 F.3d at 1168. But if the invention is completed prior to the critical date, a prior offer to sell that invention would implicate the on-sale bar. *See id.* ("Completion of the invention prior to the critical date, pursuant to an offer to sell that invention, would validate what had been theretofore an inchoate, but not yet established, bar."). Completion of the invention would validate an offer "as of the date of that completion, not the date of the original offer." *Id.* In short, as long as the date of validation (*i.e.*,

8. "Once a defendant demonstrates a *prima facie* case of on-sale or public use, the patent holder must 'come forward with convincing evidence to counter that showing.'" *U.S. Envtl. Prods., Inc.*, 911 F.2d at 716 (citations omitted). Without shifting Andrx's initial burden of proof, I find that Elan has "failed to meet [its] burden of coming forward with sufficient evidence to counter [Andrx's] *prima facie* showing of an on-sale bar." *Id. See also TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971–72 (Fed.Cir.1984) ("[I]f a *prima facie* case is made of public use, the patent owner must be able to point to or must come forward with convincing evidence to counter that showing.").

completion) is before January 14, 1990, then the on-sale bar applies.

Without question, Elan completed the formulation of its once-daily naproxen tablet no later than the first half of 1988. First, Elan's March 28, 1988, letter to Schering Laboratories indicates that Elan's once daily naproxen tablet was in stage 3 of development—preparation of a registration dossier. *See* Defendant's Exh. 37. In order for a product to advance to stage 3 of development, it must have progressed through stage 2 of development, which in Elan's own words consists of optimizing the formulation and developing the final product. *See id.* In other words, Elan was preparing a registration dossier for a completed and finalized formulation of its once-daily naproxen tablet. *See id.* This letter to Schering, from one of the inventors of the '320 patent, Mr. Mulligan, shows that Elan's once-daily naproxen formulation was ready for patenting as early as March 28, 1988. Second, in a letter dated May 23, 1988, an Elan executive wrote the following: "We have completed the development of a once daily dosage form comprising multiparticulate controlled release product incorporated in a scored tablet." Defendant's Exh. 12 at E2 072943–44; Defendant's Exh. 38 at E2 072967–68. Third, in its advertisement in the June 22, 1988, edition of SCRIP World Pharmaceutical News, Elan "announce[d][the] completion of the first ONCE DAILY formulation of NAPROXEN." Defendant's Exh. 53 at 7. This advertisement was for the product Naprelan®, whose formulation falls within the scope of the claims of the '320 patent. *See* Pretrial Stipulation at Exh. 3 ¶ 16. Fourth, Elan's 1988 annual report described its SODAS and SODAS–HC drug delivery system, the same type of technology described in the '320 patent. *See* Defendant's Exhibit 54 at 4–6. Thus, Elan's own documents essentially show that its once-daily formulation of naproxen was

"ready for patenting" within the meaning of *Pfaff* as early as the first half of 1988, almost two years prior to the critical date.

In sum, it is not subject to reasonable dispute that Elan completed the formulation of its once-daily naproxen tablet by mid–1988. The only remaining question, then, is whether the invention that was completed by that time was the same invention that was offered for sale in the August 7, 1987, letter to Lederle. *See Pharmacia, Inc.,* 727 F.Supp. at 712. Where the matter is in dispute, a district court has an obligation to determine whether the limitations of the patent are met by the product whose sale or offer for sale triggers § 102(b)'s on-sale bar. *See Dana Corporation,* 279 F.3d at 1375. Tellingly, however, Elan does not dispute that the product offered in the letter is the same one that was completed. *See* Elan's Proposed Findings of Fact and Conclusions of Law ¶¶ 96–239. *See generally UMC Elecs. Co.,* 816 F.2d at 656 ("[T]he challenger has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. If these facts are established, the patent owner is called upon to come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the grace period."). The Lederle letter identifies the product as a once-daily naproxen tablet and identifies the dosage as 500 mg. *See* Defendant's Exh. 60. Other subsequent documents identify the product available for licensing as Elan's once-daily naproxen tablet. *See* Defendant's Exh. 12, 38, 39, 53, 54. For example, the information contained in the September 22, 1988, telefax sent by Elan to Warner Lambert contains

the composition and manufacturing information found in Example 1 of the '320 patent. *See* Defendant's Exh. 57 at E1 079363-64; Defendant's Exh. 2 at col. 7–8; Rzucidlo Testimony, Trial Transcript at 1236; Mulligan Deposition at 256–267. This telefax coincides temporally with the draft agreement that Elan was preparing with Warner Lambert, which proposed terms that were strikingly similar to those proposed in the August 7, 1987, letter to Lederle. *See* Plaintiff's Exh. 256. In short, all of the documents submitted into evidence suggest that the once-daily naproxen formulations are one and the same. *See* Mulligan Dep. at 72–83; Rhodes Testimony, Trial Transcript at 648–49; Rzucidlo Testimony, Trial Transcript at 1298–99. I therefore conclude that the embodiment of the product offered in Elan's August 7, 1987, letter to Lederle falls within the scope of the claims of Elan's '320 patent.

### IV. CONCLUSION

In light of the record evidence, I am put in the unenviable position of having to invalidate Elan's '320 patent. Andrx has presented clear and convincing evidence that Elan offered for sale the embodiment of the '320 patent prior to the critical date, and that the offered invention fully anticipated the patent. In view of the "strong policy of preventing exploitation of the commercial value of an invention while deferring commencement of the statutory term," I hereby declare Elan's '320 patent invalid under 35 U.S.C. § 102(b). *See C.R. Bard, Inc.,* 157 F.3d at 1378 (Mayer, C.J., concurring in part). In light of my ruling on the § 102(b) issue, the parties' remaining contentions are moot. Final judgment will be entered by separate order.

### ORDER ON POST TRIAL MOTIONS

Elan Corporation sued Andrx Pharmaceuticals for patent infringement under 35 U.S.C. §§ 271(e) and 281–283. Andrx answered and interposed affirmative defenses and counterclaims, including a claim that Elan's patent was invalid. After a bench trial, I found that Elan's patent for a once-daily naproxen sodium tablet was invalid because Elan violated the on-sale bar. *See* 35 U.S.C. § 102(b). Following entry of judgment in favor of Andrx, Elan filed a motion for reconsideration and a motion to amend and supplement the findings of fact. Andrx filed a motion to amend the judgment. For the reasons set forth below, Elan's motion for reconsideration [D.E. 240–1] and motion to supplement [D.E. 240–2] are DENIED. Andrx's motion to amend the judgment [D.E. 239] is DENIED.

### I. BACKGROUND

The relevant facts of this case are set out in full detail in the prior findings of fact and conclusions of law [D.E. 237]. Elan is an Irish corporation engaged in the business of researching and developing new pharmaceutical products which it sells throughout the world. Andrx is a Florida corporation engaged in the business of developing generic equivalents to brand-name pharmaceutical products.

On March 29, 1994, Elan filed a New Drug Application with the Food and Drug Administration for its once-daily naproxen sodium tablet Naprelan®. Prior to that filing, on August 7, 1987, Kenneth E. McVey, Executive Vice–President for Business Planning and Commercial Development at Elan, sent a letter to K. Michael Forrest, Vice President of Lederle Laboratories. I found that this letter constituted an offer for sale of the once-daily naproxen sodium tablet, and that Elan's patent was, therefore, invalid under the on-sale bar as codified in 35 U.S.C. § 102(b).

### II. ANALYSIS

#### A. ELAN'S MOTION FOR RECONSIDERATION

Elan raises several arguments in its mo-

tion for reconsideration.[1] First, Elan argues that the Lederle letter was not in dispute with respect to the on-sale bar, and the ruling that it constituted an offer for sale was, therefore, erroneous. Second, Elan suggests that its post-trial submission of Kenneth McVey's declaration establishes that the Lederle letter was not an offer for sale. Third, it contends that Andrx failed to establish by clear and convincing evidence that the subject of the Lederle letter embodied each of the claims of the patent. Fourth, Elan argues that the finding that the product was "ready for patenting" at the time of the letter is erroneous. Finally, Elan argues that I incorrectly applied the defunct "totality of the circumstances" test in finding that Elan had offered the product for sale. I will discuss each of these arguments in turn.

### 1. THE LEDERLE LETTER WAS IN DISPUTE

■ Elan argues that I erred in finding that the Lederle letter constituted an offer for sale because the letter was not in dispute. This argument is not well taken. The parties generally stated that an issue to be litigated at trial was whether the product was on-sale in the United States before January 14, 1990. *See* Joint Pretrial Stipulation, Exh. 4 at 5 [D.E. 79]. This statement of the issue did not limit the analysis to any specific documents, and certainly did not exclude consideration of the Lederle letter. Additionally, the par-

ties' actions indicated that the letter was in dispute. First, the letter was listed on the parties' pretrial exhibit list. Second, Elan's proposed findings argued, in detail, that the letter did not constitute an offer for sale. *See* Elan's Proposed Findings at ¶¶ 180–191 [D.E. 213]. Third, both parties' experts testified regarding the letter and its effect. *See* Trial Transcript at 1237–39, 1770–72.

Despite this wealth of information in the record, Elan contends that the letter's status as an offer for sale was not in dispute because both parties' experts testified that it merely involved licensing possibilities and did not deal with any sort of offer. I am not, however, bound by the parties' characterization of the evidence. *See, e.g., Murphy v. City of Flagler Beach,* 846 F.2d 1306, 1310 (11th Cir.1988) (holding that a factfinder is free to reject even non-controverted evidence); *Burston v. Caldwell,* 506 F.2d 24, 26 (5th Cir.1975) (court is not required to accept testimony, even if uncontested); *Goodwin v. Smith,* 439 F.2d 1180, 1182 (5th Cir.1971) (same).[2]

As a factfinder, I found that the Lederle letter, viewed objectively, was an offer for sale. This finding need not be in line with the characterization of the letter by the parties or their experts. Accordingly, I reject Elan's argument that the letter was not in dispute.

---

1. Some of Elan's contentions stem from the fact that there was a change in the relevant law after trial, but prior to the issuance of the findings of fact and conclusions of law. The Federal Circuit, in *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1046–47 (Fed.Cir.2001)—a decision issued after the trial in this case—ruled that application of the on-sale bar requires a formal offer under contract law principles. At trial, the parties had geared their strategy toward the then existing Federal Circuit precedent. At the December 19, 2002, hearing, I offered the parties the

option of reopening the record and presenting evidence specifically related to the Lederle letter under the *Group One* test. Counsel for both Elan and Andrx declined this option. Based on counsels' representations at that hearing, Elan's motion to supplement [D.E. 240–2] is DENIED except as to Mr. McVey's declaration.

2. I note also that the experts' characterizations of the letter were not rendered under the now-applicable *Group One* standard.

## 2. THE LEDERLE LETTER WAS AN OFFER FOR SALE

Elan attached the declaration of Mr. McVey to its post-trial motion. Mr. McVey was an Executive Vice–President of Elan in 1987, and he authored the disputed letter to Michael Forrest at Lederle Laboratories. In his declaration, Mr. McVey discusses at length his view that the letter was not, and was not intended to be, an offer for sale. He characterizes the letter as a solicitation for Lederle to become Elan's partner in the development of the naproxen tablet. *See* Motion for Reconsideration, Exh. A at ¶ 23 [D.E. 240].

Mr. McVey's declaration is certainly relevant. He authored the letter and his intentions in writing it relate to the proper interpretation of its contents. His testimony, however, is not dispositive. As discussed at length in the prior order, the determination of whether an offer has been made is an objective one under *Group One.* Although Mr. McVey's testimony is relevant to this determination, his characterization of the letter does not mandate a finding that it was not an offer, and I do not agree with that characterization.

Elan also pointed to the deposition testimony of K. Michael Forrest, the recipient of the letter from Mr. McVey. Mr. Forrest testified that, although he did not remember receiving the letter, *see* Deposition of K. Michael Forrest at 14 [D.E. 267], he would have forwarded it to the product assessment/licensing department of Lederle. *See id.* at 17. While Mr. Forrest's reaction to the letter may be relevant to a determination of whether the letter constituted an offer, his testimony that he does not recall receiving the letter indicates that he is merely offering a speculative opinion.

In short, I have considered Mr. McVey's declaration and Mr. Forrest's testimony. This evidence does not, however, change my finding that the Lederle letter constituted an offer for sale under *Group One* and its progeny.[3]

## 3. ELAN WAIVED ITS ARGUMENT THAT THE SUBJECT OF THE LEDERLE LETTER DID NOT EMBODY THE PATENT CLAIMS

 Elan contends that Andrx failed to show by clear and convincing evidence that the subject of the Lederle letter embodied each of the claims of the completed product. In order to show that a patent is invalid under the on-sale bar, the party asserting invalidity must demonstrate by clear and convincing evidence that (1) there was a definite sale or offer to sell more than one year before the application for the subject patent, and (2) that the subject matter of the sale or offer to sell fully anticipated the claimed invention. *See Group One,* 254 F.3d at 1045–46.

Elan argues that Andrx failed to introduce any evidence relating to the second prong of this test, and therefore failed to carry its substantial burden. Elan, however, through its actions before, during, and after trial, waived any such argument.

---

**3.** I have also considered Federal Circuit cases decided after entry of the findings of fact and conclusions of law. I find that those cases applying the *Group One* test, and holding that there was no commercial offer for sale, are distinguishable. *See Minnesota Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1308 (Fed.Cir.2002) (no offer for sale where holder of patent sent samples of the product to various companies, without providing any other terms); *In re Kollar,* 286 F.3d 1326, 1330–31 (Fed.Cir.2002) (no offer for sale where the parties' agreement dealt with research and development and right under a patent). Although I understand that Elan disagrees with my view, I do not think the Lederle letter is merely "the offer of a license under a patent and a description of the invention, without more." *Id.* at 1332.

Where the matter is in dispute, a district court has an obligation to determine whether the claims of the patent are met by the product whose sale or offer for sale triggers § 102(b)'s on —sale bar. *See Allen Engineering Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345–46 (Fed.Cir. 2002); *Dana Corp. v. American Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed.Cir. 2002). In the present case, however, the matter was not in dispute.

I acknowledge that the parties believed that claim construction relating to the on-sale bar was *generally* an issue. *See* Joint Pretrial Stipulation, Exh. 4 at 5 (stating that an issue to be litigated was "[w]hether Andrx has proved by clear and convincing evidence that a formulation meeting each and every limitation of claims 1, 3, 5, 6, 8, and 11–17 of the '320 patent was on sale in the United States before January 14, 1990"). This fact alone, however, does not overcome Elan's other actions showing that it waived this argument. Indeed, while Elan strongly argued that the Lederle letter did not constitute an offer for sale, it never contested that the subject of that letter fully anticipated the claimed invention.[4]

In their joint pretrial stipulation, the parties stated that "[a]lthough the Elan formulation referenced in the SCRIP announcement fell within the scope of each of claims 1–17 of the '320 patent, the an-nouncement did not itself provide or suggest any information regarding the composition of the Elan formulation." *Id.* at 10, ¶ 29. The SCRIP announcement appeared on June 22, 1988, less than 11 months after Mr. McVey wrote the Lederle letter. Although the statement in the pretrial stipulation does not itself indicate that the subject of the Lederle letter also fell within the scope of the claims of the '320 patent, it does provide a background for Elan's waiver of its claim construction argument.

Elan's expert, Vincent Colainni, testified on the on-sale bar issue. He discussed various exhibits and opined that they should not be considered offers for sale. Mr. Colainni testified specifically about the Lederle letter. *See* Trial Transcript at 1770–72. At no point, however, did he indicate that the subject of that letter was not the same product as the completed invention. Indeed, he was never asked a question relating to that issue in regard to any of the documents that could be considered an offer for sale. Additionally, Elan's other experts did not testify on this issue, and it was never mentioned in closing arguments.[5]

Elan's waiver of this argument is also demonstrated by its post-trial filings. In its proposed findings of fact and conclusions of law, Elan never discussed claim construction in relation to the on-sale bar.

---

**4.** To the extent that the pretrial stipulation indicated that claim construction was an issue to be litigated as to the Lederle letter, I hold that Elan's subsequent actions operated as an implied consent to amend the stipulation to conform to the proceedings at trial. *Cf. Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1565–66 (Fed.Cir. 1984) (trial court has discretion to allow an amendment of pleadings to conform to actual issues litigated at trial); *Sun–Fun Products, Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 192 n. 7 (5th Cir.1981) (holding that "defendant's agreement to the stipulation and failure to object to evidence or the issues contained therein is an implied consent to an amendment to conform to the evidence"); *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 95–96 (5th Cir.1975) (party's actions at trial may constitute explicit consent to informal amendment of pleadings).

**5.** By referring to the testimony of Elan's witnesses, I do not mean to shift the burden of proof from Andrx to Elan. Instead, I cite this testimony only to show that Elan never made an issue about whether the product in the Lederle letter anticipated the claims of the '320 patent.

See Elan's Proposed Findings at ¶¶ 96–239. The proposed findings lay out in detail how each of the contested documents do not constitute offers for sale, yet nowhere does Elan ever propose that the subjects of those documents are not the same as the claimed invention. See id. at ¶¶ 130–222. Specifically, the discussion of the Lederle letter in the proposed findings never raises this argument. See id. at ¶¶ 180–191. In its proposed conclusions regarding the various documents, Elan only states that "[f]or the foregoing reasons, none of the licensing-related documents would have been objectively viewed as an offer to sell an embodiment of the '320 patent." Id. at ¶ 218.

In sum, throughout the course of this litigation, Elan never seriously contested that the subject of the Lederle letter was the same as the claimed invention.[6] Its pretrial stipulation, presentation of evidence at trial, and post-trial filings all dealt exclusively with the issue of whether there was an offer for sale. Accordingly, Elan waived its argument that Andrx failed to establish by clear and convincing evidence that the subject of the Lederle letter fully anticipated the claimed invention.

### 4. ANDRX ESTABLISHED THAT THE SUBJECT OF THE LEDERLE LETTER WAS THE SAME PRODUCT

 Even assuming that Elan did not waive its argument, I find that Andrx established by clear and convincing evidence that the subject of the Lederle letter was the same product as the claimed invention.

Andrx's expert, Eugene Rzucidlo, testified that the Lederle letter was "clearly referring to the naproxen product that was the subject of the patent application." Trial Transcript at 1238. Elan never addressed this testimony during Mr. Rzucidlo's cross examination. See id. at 1258–1342. And, as discussed above, none of Elan's experts challenged Mr. Rzucidlo's testimony, and the issue was never mentioned during closing arguments.

Mr. Rzucidlo's testimony was permissible. See generally Snellman v. Ricoh Co., 862 F.2d 283, 287 (Fed.Cir.1988) ("Although claim interpretation is a question of law, expert testimony is admissible ... to give an opinion on the ultimate question of infringement."). "The responsibility for challenging the factual underpinnings of the testimony fell squarely on [Elan] during cross-examination." Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed.Cir.1991). See also Bryan v. FMC Corp., 566 F.2d 541, 545 (5th Cir.1978) ("Rule 705 shifts to the cross-examiner the burden of eliciting the bases of an expert witness' opinion."); United States v. Santarpio, 560 F.2d 448, 454–55 (1st Cir.1977) (court was entitled to accept the expert's conclusion even though expert did not describe the factors on which his opinion rested; defendant never cross-examined on basis for opinion nor attempted to show its inadequacy). Accordingly, I may and do accept Mr. Rzucidlo's testimony that the product referenced in the Lederle letter fully anticipated the claims of the '320 patent. See Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 24 (5th Cir.1974) (factfinder has responsibility of judging credibility of witnesses, resolving conflicting evidence, and assessing the weight of expert testimony).

Additionally, the parties stipulated that the product in the SCRIP announcement embodied all the claims of the completed invention. Given the proximity in time of

---

6. As discussed at the hearing on December 19, 2002, Elan's position may have been a result of its view of the then-existing Federal Circuit precedent. Both parties, however, have declined my invitation to reopen the evidence further in light of the change in the law.

the SCRIP announcement and the Lederle letter, it is reasonable to find that the subject of both was the same product, and I make such a finding.

In sum, I find alternatively that the SCRIP stipulation, its temporal proximity to the Lederle letter, and Mr. Rzucidlo's uncontradicted expert testimony establish by clear and convincing evidence, in the absence of *any* evidence to the contrary,[7] that the subject of the Lederle letter was the same as the claimed invention.

### 5. THE PRODUCT WAS "READY FOR PATENTING" AT THE TIME OF THE LEDERLE LETTER

Elan argues that I erred in finding that the once-daily naproxen sodium tablet was "ready for patenting" at the time of the Lederle letter. In order for the on-sale bar to render a patent invalid, (1) the product must be the subject of a commercial offer for sale, and (2) the invention must be ready for patenting. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). I found that "it is not subject to reasonable dispute that Elan completed the formulation of its once-daily naproxen tablet by mid–1988," and that the evidence established that the product was ready for patenting by the time the Lederle letter was written. Elan has proffered no persuasive reasons why this finding should be overturned, and I, therefore, adhere to the prior ruling.

### 6. THE "TOTALITY OF THE CIRCUMSTANCES" TEST WAS NOT APPLIED

Finally, Elan argues that I incorrectly applied the defunct "totality of the circumstances" test in ruling that the Lederle letter constituted an offer for sale. This argument was withdrawn by Elan at the December 19, 2002, hearing, and therefore

need not be addressed. In any event, the prior order applied *Pfaff* and its progeny, including *Group One.*

### B. ANDRX'S MOTION TO AMEND

A court has discretion whether to address remaining issues once it has disposed of a case. *Cf. Drake v. Kemp,* 762 F.2d 1449, 1457 n. 9 (11th Cir.1985). Although the parties are still involved in antitrust litigation where the issue of infringement is relevant and may need to be resolved, I exercise my discretion and do not address the other issues in the case.

### III. CONCLUSION

Elan's motion for reconsideration [D.E. 240–1] and motion to supplement [D.E. 240–2] are DENIED, with the exception that Mr. McVey's declaration has been considered. Andrx's motion to amend the judgment [D.E. 239] is DENIED. All pending motions are DENIED AS MOOT, and these cases are CLOSED.

---

7. As discussed above, Elan was offered an opportunity to reopen the record and present evidence on this issue. It declined that op- tion, and in fact indicated that it possessed no evidence relating to the composition of the subject of the Lederle letter.